[No. 8006.  Department One.  January 8, 1910.]

BEN STANLEY REVETT, *Appellant*, v. GLOBE NAVIGATION
COMPANY, *Respondent*.[1]

CARRIERS—OF GOODS—CONTRACT—BREACH—RESCISSION—SHIPPING.
A carrier's breach of contract, by reason of the disablement of a
vessel and the abandonment of her sailing, is not waived or the
contract of carriage rescinded by a telegram calling upon the carrier
to forward the freight by next sailing and to do all possible to
remedy the delay and that the consignor would do the same, es-
pecially when a letter referring to the telegram and sent at the
same time did not admit the carrier's right to breach the contract
and contained only the consignor's assurance that he would do all
he could to mitigate the damage.

SAME—TENDER OF CARGO—WHEN EXCUSED.  It is not ground for a
nonsuit, in an action for breach of contract of the carriage of
freight, that the freight was not delivered or tendered on the dock
for shipment on the sailing date, when the ship was not ready at
that time to receive the cargo and the sailing date was later can-
celled because of her disability, especially where there was tes-
timony that the load was ready and waiting when she got in, or in
cars ready to be transferred, evidently so prearranged for convenience
in unloading heavy materials from the cars without passing through
a warehouse.

SAME.  A nonsuit, in an action for breach of contract to ship
cargoes of freight on or about two specified dates, cannot be sus-
tained by reason of the fact that certain articles were not ready for
shipment on the first sailing date, when it appears that they were
not intended for that cargo and were to be shipped later, and the
damage did not result from the failure to ship such part earlier.

SAME—CONTRACT— BREACH — CONSTRUCTION.  A consignor's con-
tract to ship on a carrier's line all of his freight, consisting of two
cargoes of lumber and heavy machinery, is not breached by him, as
a matter of law, by the shipment of camp equipment and property of
a like character, which went forward with the consignor's men on
one or more ships of another line; especially where the carrier's
first ship was loaded to capacity and refused to take all that had
been agreed should go on her.

SAME.  Such loss of carriage, if allowable at all, would only be
an offset, and could not bar an action for general damages on
breach of the contract, the contract not having been rescinded.

[1]Reported in 106 Pac. 176.

Appeal from a judgment of the superior court for King county, Gilliam, J., entered March 14, 1908, upon granting a nonsuit, in an action on contract, after a trial before the court and a jury. Reversed.

*Richard Saxe Jones,* for appellant.

*H. R. Clise* and *C. K. Poe,* for respondent.

CHADWICK, J.—This action was brought to recover damages for an alleged breach of contract of carriage. Defendant was the owner of, and operated, a line of steamers between the ports of Seattle and Nome, Alaska, during the season of 1905. The "Tampico" was advertised to sail on or about June 1, and the "Eureka" was to follow on or about June 15. Plaintiff is a manufacturer of mining dredges, and had contracted with the Seward Peninsular Mining Company, operating near Nome, to set up a mining dredge complete and ready for operation on or before September 1, 1905. A contract of carriage was entered into between the plaintiff and defendant on the 27th day of May, the material parts of which follow:

"Seattle, Wash., U. S. A., May 27, 1905.

"Mr. B. Stanley Revett, Hotel Butler, City.

"Dear Sir: We agree to ship for you and you hereby agree to deliver to us for shipment from Seattle to Cape Nome on steamship Tampico and Eureka, Tampico sailing from Seattle on or about June 1st and the steamship Eureka sailing from Seattle on or about June 15th, all of the freight you have to go to Cape Nome during the season of 1905 and more particularly a shipment of about 225 tons of machinery included in which shipment are two boilers weighing 11 tons each, 2 pieces weighing 6,300 lbs each and 2 pieces 4,700 lbs each, now on the Northern Pacific cars, and 190,000 ft of lumber contained in which are 2 pieces to be made into spuds weighing about 6 tons each, shipment to be made by the Stetson Post Mill Co., of Seattle.

"On the sailing of the Tampico, June 1st, you agree to ship and we agree to carry not less than 75,000 ft. of aforesaid lumber and one car of bolts and any part of the shipment of the machinery which we desire to carry forward on that

vessel.   On the sailing of the steamship Eureka on or about the 15th of June you are to ship the balance of the lumber from the Stetson Post Mill Co. and the balance of the machinery not shipped on the Tampico."

Of the total shipment of seventy-five thousand feet of lumber which was to be carried on the Tampico, only sixty-three thousand five hundred feet went forward, the captain refusing to take more.   It was intended that the balance of the lumber, as well as the other freight, should go forward on the Eureka.   On or about June 25 plaintiff's agent at Seattle was informed by Mr. Thorndyke, the general agent of defendant, that the Eureka was disabled and that her sailing date had been canceled.   This fact was communicated to plaintiff at Breckenridge, Colorado, who immediately telegraphed Mr. Thorndyke as follows:

"Eureka sailing abandoned.   Request you ship balance lumber first Nome sailing.   Machinery on Tampico.   Do all you can remedy.   I will do all in my power.   Writing."

The balance of the lumber was shipped on the Olympian, a vessel belonging to another company, which sailed on or about July 15, and the dredger machinery followed on the second trip of the Tampico, which sailed on or about July 21. It is alleged that the machinery arrived too late to be set up for delivery on or before September 1, and because of defendant's failure to keep its contract, plaintiff has been damaged.   From a judgment of nonsuit, plaintiff has appealed.

It appears that the trial judge was moved to grant the nonsuit because of the telegram quoted above.   This he construed to be a rescission of the original contract of carriage. Standing alone there might be some difference of opinion as to the legal effect of the telegram, but when considered in the light of the letter written at the same time and of which the telegram carried notice, the telegram cannot be made to bear that construction.   The material parts of the letter, after quoting and confirming the telegram, are as follows:

"I am seriously afraid that the delay in getting the balance of the lumber to Nome may seriously retard our work as I

doubt whether our men will have enough work to keep them employed until the lumber gets there. I have cabled Wilkins and asked them to arrange accordingly. The delay is a most serious one as I am under contract to the company to have the dredge built by Sept. 1st, which at the best under the conditions was an exceedingly limited time, and I would therefore urge you to do everything in your power to expedite the shipment and landing of the lumber first. You may rest assured that we will do everything in our power to remedy the delay."

Taken together these communications do not admit the right of respondent to breach the contract. They recognize a situation for which appellant was not responsible, and contain an assurance that he would do all that he could to mitigate any damages that might follow, and in turn calls upon respondent to do all that it could to remedy the delay.

It is further contended by respondent that, although the court may have erred in its construction of the telegram, nevertheless, if it appears on other grounds that the judgment was right, it should be sustained by this court. Respondent asserts, in behalf of his theory, that the testimony shows that, notwithstanding its breach, appellant was unable to complete and carry out his own contract, in that it was impossible for him to deliver the freight mentioned in the contract on the dock at the time agreed upon, and that therefore respondent is released from any obligation to him. We cannot sustain the judgment by the application of the principles invoked to maintain this contention. Respondent cannot defend because the complete shipment was not tendered at the dock on the day agreed upon—June 15—when it did not have the ship ready, or intend to have it ready, to receive the cargo. It would be a curious rule of law that would sustain a nonsuit when appellant's agent in charge had testified in speaking of the shipment to go forward on the Eureka: "Did you have your load ready for her when she got here [about June 26]? Ans. Yes, sir; had it waiting. Q. Waiting for her? Ans. Yes." Aside from this, appellant was not bound to have the

freight on the dock on the day named in the contract. On May 27. appellant wrote Mr. Thorndyke as follows:

"This will be your authority for arranging with Mr. Nadeau, agent of the Northern Pacific, to deliver to you car No. 34726, containing bolts and spikes, which it is absolutely necessary to go up on the Tampico with 75,000 feet of lumber. There are seven other cars of machinery at Tacoma at the present time, ready for delivery, and it is understood that the Northern Pacific people will transfer these cars from Tacoma to Seattle, free of charge, demurrage or wharfage, as per the arrangement made by Mr. Seegar, the general agent in New York, for delivery to S. S. Lyra, said arrangements being released through the courtesy of Mr. Frank Waterhouse, per the letter which I now enclose you. Kindly keep in touch with Mr. Nadeau in regard to a carload of machinery now in transit from the Taylor Steel & Iron Co., Highbridge, N. J., a carload of machinery from the Standard Boiler Works, Lebanon, N. J., and another carload from Reeves Engine Co., Trenton, N. J. We are promised shipments of these delayed cars by June 1st, and would ask yourself and Mr. Nadeau to arrange for them to be forwarded not later that the Tampico's sailing July 4th."

The two letters voice the agreement of the parties. Courts may well take notice of the fact that freight such as the heavy parts of a dredger may be more conveniently loaded from the car than by passing them through a warehouse, and respondent, so far as the testimony shows, may have made this arrangement for its own convenience.

The further contention, that a ladder and donkey engine, a part of the machinery included in the original contract, had not arrived in Seattle on June 15, is without merit. Reference to the letter just quoted will show that the attention of respondent had been called to the fact that other machinery, about two carloads, was to arrive, and respondent agreed to arrange for its shipment on the second trip of the Tampico. It was so shipped. The damage is alleged to have resulted by reason of the delay in shipping that which should have gone forward on the Eureka on or about

June 15. The burden was on appellant to show this, and it can make no difference—certainly it will not sustain a judgment of nonsuit—to say that something about the dredger was wanting which may have been, so far as the evidence shows, in no way responsible for the actual damages sustained, and which it had agreed should be shipped later. Respondent cannot hold appellant to the duty of tendering shipment when it was not ready to receive, or when it had agreed to direct the switching of the cars upon which the machinery was loaded ready for delivery. When it canceled the Eureka's sailing date, it was its duty to minimize the damages resulting from its arbitrary breach of the contract, and it cannot now set up a rule adopted for the protection of those who are not in default, to excuse an act which, so far as the evidence shows, is responsible for the condition out of which this action arises.

There is another question developed in the testimony and urged as a defense, and that is that appellant did not in fact ship over respondent's line all of his freight as he was bound to do under his contract, in that certain camp equipment and property of like character went forward with appellant's men on one or more ships sailing in advance of the Tampico. We are unwilling to hold that such freight as this is shown to be is, as a matter of law, freight within the contemplation of the contract. Aside from the fact that the whole record seems to indicate that the freight intended by the parties was the lumber and dredger machinery, the testimony shows, as we have indicated, that the captain of the Tampico refused a part of the freight that was tendered, because his ship was loaded to its capacity. It is fair to presume that the camp equipment would have been likewise refused on the first trip of the Tampico. Upon the present record, the testimony does not show a breach of the contract on that account. The contract not having been rescinded, the amount lost on this account would, if allowable at all, amount to no more than an offset and could

not be pleaded in bar of a right to recover general damages.

The judgment of the lower court is reversed, with directions to try the case on its merits.

RUDKIN, C. J., FULLERTON, GOSE, and MORRIS, JJ., concur.