## THE INDRAPURA.

### (District Court, D. Oregon. April 4, 1910.)

### No. 4,666.

1. SHIPPING (§ 121*)—CARRIAGE OF GOODS—IMPLIED WARRANTY OF SEAWORTHINESS.

In every contract for the carriage of goods by sea, in the absence of agreement otherwise, there is an absolute implied warranty by the carrier that the ship is seaworthy at the time of the beginning of her voyage, and reasonably fit to encounter the ordinary perils that may be expected, and her liability for loss or injury to cargo from a breach of such warranty is not affected by Harter Act Feb. 13, 1893, c. 105, 27 Stat. 445 (U. S. Comp. St. 1901, p. 2946).

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 449–451; Dec. Dig. § 121.*

Implied warranty of seaworthiness see notes to The Carib Prince, 15 C. C. A. 388; Neilson v. Coal, Cement & Supply Co., 60 C. C. A. 179.]

2. SHIPPING (§ 140*)—LIABILITY OF VESSEL FOR INJURY TO CARGO—STIPULATIONS IN BILL OF LADING.

Stipulations in a bill of lading exempting the vessel from liability for loss or injury to cargo are to be construed as operating prospectively, and not as relieving her from liability for unseaworthiness at the beginning of the voyage, unless so expressed in clear and explicit language.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 497; Dec. Dig. § 140.*]

3. SHIPPING (§ 121*)—LIABILITY OF VESSEL FOR INJURY TO CARGO—"SEAWORTHINESS."

The term "seaworthy," as now construed, has relation to the article carried and the different compartments of the ship and their particular use, as well as to the navigability of the vessel.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 450; Dec. Dig. § 121.*

For other definitions, see Words and Phrases, vol. 7, pp. 6362–6365; vol. 8, p. 7796.]

4. SHIPPING (§ 121*)—LIABILITY OF VESSEL FOR INJURY TO CARGO—UNSEAWORTHINESS.

The placing of the filling pipe extending from the engine room of a steamer to a trimming tank in the forepeak upon the floor of the inter-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

mediate hold, boxed in, and extending through the collision bulkhead, *held* not a faulty construction, which rendered the vessel unseaworthy as to cargo carried in such hold, where the evidence showed that many contemporary vessels were so constructed and rated A 1 by Lloyds. But the omission to fit such pipe with a valve or stopcock within the forepeak, or where it passed from the hold to prevent the flooding of the hold in case of a break in the pipe rendered her unseaworthy as to such cargo and liable for its injury from the flooding of the hold in consequence of the breaking of the pipe through some fault of construction.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 450; Dec. Dig. § 121.*]

In Admiralty. Suit by Gilbert Palache, George Almer Newhall, and Edwin White Newhall, partners as H. M. Newhall & Co., against the steamship Indrapura. Decree for libelants.

Williams, Wood & Linthicum, for libelants.
W. W. Cotton and A. C. Spencer, for respondent.

WOLVERTON, District Judge. Libelants sue to recover for injury sustained to cargo, namely, certain Calcutta grain bags, shipped from Hong Kong to Portland, Or., on the steamship Indrapura. The bags were carried in hold No. 1, and were injured by sea water, which escaped from the filling pipe extending from the engine to the forepeak or trimming tank; the pipe having broken through some means not definitely known to the parties. The single ground upon which recovery is sought is faulty construction of the ship in its arrangement and equipment of the filling pipe.

The ship is provided with ballast tanks underneath her holds; also with a trimming tank in her forepeak. The pipe in question was carried from the engine room along on the floor of the holds, or above what is termed the double bottom—that is, above the ballast tanks—to the collision bulkhead, where it entered through the bulkhead into the forepeak tank, and was deflected downward on the inside of the tank. The pipe was of cast iron 3½ inches in diameter, and ⅝ of an inch thick, connected by lead joints to give flexibility and prevent breakage. It was encased in a wooden box, perhaps ten inches in height, constructed of two-inch material. The forepeak tank has a capacity of 175 tons of water, and at the time of the accident was carrying water to a depth of about 20 feet above the level of the pipe. On the morning of the 24th of March, 1903, after the ship had encountered some heavy seas, water at the depth of from four to five feet was discovered in hold No. 1, and, upon investigation, it was found that the water in the forepeak tank had settled some 14 feet, thus showing that the leakage was from the tank. Upon arrival of the ship in Portland early in April, when the cargo was removed, it was found that a joint of the filling pipe had been broken near the center of hold No. 1, thus allowing the water to escape from the forepeak tank. The bags were stowed in bales, and the most reasonable supposition is that the cargo shifted with some sudden movement or action of the ship, causing pressure upon the casing and the pipe, thus breaking the latter.

It is contended by libelants that there was faulty construction in the

manner of laying the pipe, and in not providing the same with a stop-cock or valve, either within the forepeak or just aft of the collision bulkhead. It is claimed that the pipe should have been carried beneath the flooring of the holds of the ship, through the ballast tanks, instead of above the floor and within the holds, and that it should have pierced the bulkhead below the line of the floor. Thus constructed, the ballast tanks being tight, there could be no escape of water into the cargo hold by any breakage of the pipe, and there would scarcely be any need of the stopcock or valve. But, not being so constructed, the fitting of a stopcock or valve in the pipe as suggested would, it is manifest, serve to prevent the escape of water from the trimming tank in case of leakage from the pipe outside. Based upon this hypothesis, it is further contended that, while the ship was seaworthy as to her hull and outward construction, she was not seaworthy as to hold No. 1, and hence that the respondent is liable for the damages resulting to libelants' cargo by escape of water from the trimming tank. It is the express doctrine of the Supreme Court that:

"In every contract for the carriage of goods by sea, unless otherwise expressly stipulated, there is a warranty on the part of the shipowner that the ship is seaworthy at the time of beginning her voyage, and not merely that he does not know her to be unseaworthy, or that he has used his best efforts to make her seaworthy. The warranty is absolute that the ship is, or shall be, in fact seaworthy at that time, and does not depend on his knowledge or ignorance, his care or negligence." The Edwin I. Morrison, 153 U. S. 199, 210, 14 Sup. Ct. 823, 825, 38 L. Ed. 688.

Chancellor Kent says:

"It is an implied warranty in the contract that the ship be sound for the voyage, and the owner, like a common carrier, is an insurer against everything but the excepted perils." 3 Kent's Com. 205.

The doctrine is so firmly settled that it is scarcely necessary to extend the authorities. But see The Caledonia, 157 U. S. 124, 131, 15 Sup. Ct. 537, 39 L. Ed. 644; The Glenfruin, 10 P. D. 103; The Cargo ex Laertes, 12 P. D. 187; and The Ninfa (D. C.) 156 Fed. 512.

The pertinent and cardinal inquiry is: Under every such contract was the vessel at the time of her departure in a state, as regards the stowing and receiving of her cargo, reasonably fit to encounter the ordinary perils that might be expected while upon her projected voyage? If she was not, and loss and injury ensued ascribable to such condition, the ship and the owner thereof will be held responsible therefor. Nor does the Harter act (Act Feb. 13, 1893, c. 105, 27 Stat. 445 [U. S. Comp. St. 1901, p. 2946]) relieve the shipowner from his implied warranty of seaworthiness at the time of the ship's departure, without express stipulation in the contract relieving him of such obligation, even where due diligence has been exercised to make her seaworthy. The purpose of that act is, according to the interpretation given to it by the Supreme Court, to enable the owner to stipulate in contravention of the implied warranty, providing he has used due diligence, proper care, and reasonable foresight to make his vessel in all respects seaworthy and fit for the voyage undertaken. The Carib Prince, 170 U. S. 655, 18 Sup. Ct. 753, 42 L. Ed. 1151; The Silvia,

178 F.—38

171 U. S. 462, 19 Sup. Ct. 7, 43 L. Ed. 241; The Irrawaddy, 171 U. S. 187, 18 Sup. Ct. 831, 43 L. Ed. 130; The Southwark, 191 U. S. 1, 24 Sup. Ct. 1, 48 L. Ed. 65. By the terms of the bill of lading, "acts of God, * * * misfeasance, error in judgment, any neglect or default whatsoever of pilots, master or crew, in the management or navigation of the ship, * * * accidents to or from machinery, boilers or steam, or any other accidents, * * * disasters or dangers of the seas * * * or steam navigation, of whatever nature or kind, or from any other causes of whatever nature," are excepted from the respondent's warranty or obligation. It was held in The Caledonia and The Carib Prince, supra, that these stipulations, by way of exceptions to the obligation to carry safely and deliver in as good condition as received on board, operate prospectively, and relate to things and forces that may give rise to accident and injury subsequent to entering upon the voyage, but not to conditions of unseaworthiness existing at the commencement thereof; the principle which dominated the court's ruling being that, where it is sought to show a modification or an abrogation, through exceptions in the bill of lading, of the owner's implied but primary obligation to furnish a seaworthy vessel from the beginning of the service, it must appear by clear and explicit language that such was the very purpose of the parties to the contract. Clauses exempting the owner from the general obligation are to be confined within strict limits, and should not be extended, says the court, "by latitudinarian construction or forced implication so as to comprehend a state of unseaworthiness, whether patent or latent, existing at the commencement of the voyage."

There can be little question that a vessel seaworthy as to navigation may be unseaworthy as to cargo. So a ship may be seaworthy as to one part of the cargo and unseaworthy as to another. The warranty of seaworthiness extends, not alone to the vessel, but also to its reasonable and suitable adaptability and fitness to carry each particular article well known to commerce. Especially would this be so where the article is one carried in the usual course upon the sea or navigable waters. The term "seaworthy" in its earlier use, it must be admitted, was not of as broad or extended signification as under the present advanced state of commerce and transportation facilities; but it now has relation to the article carried, and the different compartments of the ship and their particular use as well as to the navigability of the ship. The Southwark, supra; The Thames, 61 Fed. 1014, 10 C. C. A. 232; The British King (D. C.) 89 Fed. 872.

We come now to a consideration of the question whether there was faulty construction, first, in the laying of the filling pipe above the double bottom and upon the floor within hold No. 1; and, second, in not providing the pipe with a stopcock or valve within the forepeak tank, or immediately aft of the collision bulkhead. Three witnesses, namely, Albert Diericx, Stephen Shotton, and F. H. Evers, whose depositions were taken in San Francisco, concur in the strong opinion that such a construction of the pipe is faulty, and say, without reserve, that its proper construction is inside the double bottom, entering below the ceiling thereof from the forepeak. The advantages assigned for such a construction are that in case of a breakage of the pipe the

water would escape into the ballast tanks, and, being thus secured, would do no hurt to the cargo, and there could be no liability of water entering through the bulkhead in case of a collision allowing it to enter the forepeak tank from without. It would seem, further, from the testimony of Veysey, that Lloyd's rules do not permit of piercing the collision bulkhead above the floor of the cargo holds of the ship. Rule No. 8 is read into the record, and is as follows:

"No sluice valve or cock is to be fitted to the collision bulkhead. No sluice valves or cocks are to be fitted to the engine room or other watertight bulkheads, unless they are arranged so as to be at all times accessible. When sluice valves are fitted, they are to be so arranged as to be controlled above the load water line, and the rods are to be boxed in to prevent injury."

Diericx's construction of this rule is that it prohibits the fitting of any pipe through the bulkhead above the double bottom. On the other hand, the Indrapura was classed A 1 by Lloyd's, and Capt. Hoben testifies that at the time this ship was built, which was six or seven years prior to the time of the accident, ships were constructed with pipes running both ways. He thinks, however, that the majority were built with the pipe running through the ballast tank, and that most of them are so constructed at the present time. Further than this, it appears, by stipulation of counsel that the following steamers, loading at the port of New York about January 8, 1904, were fitted with suction pipes connecting the forepeak with engine room, laid on top of the floor on the ballast tanks, namely:

| S/S Redhill (British) | 2504 | Ts. Reg. | 100 A. I. | built | 1901 | Newcastle. |
|---|---|---|---|---|---|---|
| " Euskaro " | 1537 | " " | 100 A. I. | " | 1886 | Sunderland. |
| " Ripley " | 2508 | " " | 100 A. I. | " | 1902 | Newcastle. |
| " Reigate " | 2504 | " " | 100 A. I. | " | 1901 | " |
| " Breiz Huel (French) | 2933 | " " | 3/31 I. I. | " | 1902 | St. Nazaire. |
| " Breiz Izle " | 2960 | " " | 3/3/L. I. I. | " | 1903 | " |

From this testimony I am inclined to the opinion that the fitting of the filling pipe in question as laid in the Indrapura could not be considered a faulty construction thereof at the time of the injury to libelants' cargo, notwithstanding the piercing of the collision bulkhead above the floor of the ballast tank. I so find from the fact mainly that many ships were constructed in that way, and passed Lloyd's survey as A 1.

As to the fitting of a stopcock or valve in the pipe within the forepeak, or immediately aft of it, it seems to me that Lloyd's rules permit of that construction, or, at least, they do not inhibit it. True, they declare that no such valve shall be fitted in the collision bulkhead. A fitting of a valve in the pipe, as suggested, is not a fitting thereof in the bulkhead. But when the bulkhead is once pierced for the admission of a filling and discharging pipe, and that construction is approved, what then becomes of the objection to fitting a valve in the pipe, when it is considered that the rule against fitting a valve in the bulkhead is to prevent a piercing of that compartment? In such case the latter clause of the rule would seem to apply, namely:

"When sluice valves are fitted, they are to be so arranged as to be controlled above the load water line, and the rods are to be boxed in to prevent injury."

But, whether this be a proper interpretation of the rules, or not, it is manifest that a fitting of such a valve in a pipe that has already pierced the collision bulkhead is but a reasonable precautionary measure under the existing conditions. The collision bulkhead being pierced, the pipe passes directly through a cargo hold, and is subject to heavy pressure when the trimming tank is filled with water. A breakage in the pipe must necessarily flood the hold. While the pipe was protected by heavy boxing, even that could not make it as secure as a stop cock or valve fitted in the pipe, which would at once take all pressure off the pipe in the hold, and thus render any breakage harmless to the cargo. It does not seem to me, therefore, that the Indrapura was seaworthy as to cargo in hold No. 1. It appears that the ship encountered some stress of weather on the voyage, but not in greater degree than was ordinarily to be expected, and the breaking of the pipe could in no event be attributable to perils of the sea. Hence the cause must resolve itself into some inherent fault of construction. Otherwise the pipe would not have broken. A reasonable precautionary measure would have been the fitting of the pipe with a valve, to be operated by a rod from the deck, or at some convenient point above the cargo. For the want of such a valve, I hold the vessel was unseaworthy as to cargo in hold No. 1.

The amount of loss sustained by libelants is $1,196.20, to which should be added interest at 6 per cent. per annum from March 24, 1903, the date when the bags were damaged.