[No. 9535.  Department Two.  April 30, 1912.]

BEN STANLEY REVETT, *Appellant*, v. GLOBE NAVIGATION
COMPANY, *Respondent.*[1]

SHIPPING—CHARTER PARTIES—WARRANTIES—PRESUMPTION. In the
absence of an express stipulation to the contrary, a charter party
carries an implied warranty that the ship would be in fit condition
for the voyage.

SHIPPING—CHARTER PARTY—CONDITION OF SHIP — EXEMPTIONS—
LIABILITY—ABANDONMENT OF VOYAGE—DAMAGES. A clause in a char-
ter party exempting the owner from performance in case of dangers
of the sea resulting from latent defects in boilers etc., does not
apply to defects occurring after the execution of the contract while
the vessel was completing a voyage on which she was engaged at
the time of the chartering, and before the commencement of the
voyage contracted for; and the defendant is liable for damages by
reason of failure to make the voyage, especially where the voyage
was abandoned and other voyages undertaken for several months,
and the defects could have been repaired so as to enable her to
undertake the voyage within fifteen days from her sailing date.

SHIPPING—CHARTER PARTY—TIME FOR SAILING—ESSENCE OF CON-
TRACT. The sailing date of a steamship is of the essence of a con-
tract for affreightment of machinery and lumber from Seattle to
Nome, where the steamship company had notice that the shipper
was under bond to complete a dredge at Nome before Sept. 1, and
had cancelled a prior charter party in order to save time, which was
of vital importance.

SHIPPING—CHARTER PARTY—BREACH—FAILURE TO MAKE VOYAGE—
MEASURE OF DAMAGES. Upon breach of a charter party, by failure
to make the voyage, the sailing date being of the essence of the
contract because of the necessity of the prompt delivery of ma-
chinery and lumber for the shipper's performance of a contract to
build a dredge on or before a certain date, all of which was within
the contemplation of the parties, the measure of damages is the
shipper's expense incurred in retaining an idle crew of employees
during the period of delay caused by the breach of contract; and a
claim for expense and delay in securing his final payments for the
dredge is too remote and speculative, especially where it is not
shown that such delay would not have occurred in any event.

[1]Reported in 123 Pac. 459.

Appeal from a judgment of the superior court for King county, Sheeks, J., entered January 31, 1911, upon findings in favor of the defendant, in an action on contract, after a trial to the court.    Reversed.

*Richard Saxe Jones*, for appellant.

*H. R. Clise* and *C. K. Poe*, for respondent.

CROW, J.—This action, which was commenced by Ben Stanley Revett against Globe Navigation Company, Ltd., a corporation, to recover damages for the breach of a charter party agreement, has heretofore been in this court, 56 Wash. 550, 106 Pac. 176.    After remittitur, a new trial was had, and findings, to which the plaintiff excepted, were made as follows:

"(1)    That heretofore and on to wit: the 27th day of May, 1905, plaintiff and defendant entered into a contract of affreightment in words and figures set forth in paragraph 2 of plaintiff's complaint herein, which said contract, among other things, contained the following clause:

" 'Dangers of the sea.    Fire, explosion, bursting of boilers and pipes, breakage of shaft, latent defects in boilers, pipes, machinery or hull, stranding, collision at sea, restraints of Princes or rulers, strikes and all other unavoidable accidents excepted.'

"(2)    That the freight agreed to be delivered and delivered to the steamship Tampico on or before June 1st, was duly accepted by the defendant and shipped in accordance with said contract.

"(3)    That on the 27th day of May, 1905, the time when the said contract between plaintiff and defendant was entered into, the steamship Eureka was not at the Port of Seattle, but was then engaged in a voyage from the Port of Seattle to ports in California and return to the Port of Seattle.

"(4)    That said steamship Eureka returned to the Port of Seattle at 3 a. m. on June 20th, 1905, and that upon her return the defendant discovered certain latent defects in her boilers which were not known and could not have been discovered by the exercise of ordinary diligence at the time of the making of said contract of affreightment, which said de-

fects rendered said steamship Eureka unseaworthy to undertake a voyage to Nome, Alaska, and return without extensive repairs being made to her said boilers; that her said condition, immediately upon the arrival in Seattle, was reported to the agent of plaintiff in the city of Seattle and also communicated to plaintiff, and the balance of the lumber was shipped north on an available vessel leaving the port of Seattle after said June 20th, 1905, and that the remainder of the cargo, to wit: certain machinery, went north on the second sailing of the steamship Tampico; that said cargo was shipped as aforesaid.

"(5)    That until the return of the Eureka to Seattle on June 20th, 1905, defendant had no opportunity to discover the said defects in her boilers or to make repairs to the same, and did send a portion of said cargo on the steamship Olympia, and the balance on the steamship Tampico.    To have shipped said cargo forward on the Eureka at the time specified in said contract would have jeopardized vessel and freight."

Upon these findings, the trial judge held that the relation of carrier was not actually assumed by defendant; that it was entitled to the exemptions from liability contained in the clause set forth in finding one; and that, owing to the condition of the boilers of the Eureka at the time she was to have sailed, the defendant was excused from taking plaintiff's freight.    Thereupon the action was dismissed, and the plaintiff has appealed.

Other portions of the charter party then considered material were quoted in our former opinion, but we did not then quote the clause providing for exceptions from perils of the sea etc., as it was not then under consideration.    The cause is now before us for trial de novo, and two controlling questions are presented: (1)    Did the exception clause exempt respondent from performing its contract? and (2) if it did not, what damages is appellant entitled to recover?

Findings requested by appellant and refused by the trial judge need not be here set forth, as we will state our own findings.    The charter party, which was executed on May 27, 1905, called for two sailings by respondent's steamships,

one by the Tampico on or about June 1, 1905, and one by
the Eureka on or about June 15, 1905. The first was made,
but the second was abandoned. Respondent contracted to
have the steamship Eureka at the port of Seattle on or about
June 15, 1905, in seaworthy condition ready to receive and
carry appellant's freight. In the absence of any express
stipulation to the contrary, the charter party carried an im-
plied warranty on the part of respondent that the ship would
then be in fit condition for the voyage. 3 Kent, Commen-
taries, 205.

The evidence shows that, on or about May 26, 1905, the
steamship Eureka sailed for San Pedro, California, with a
cargo of lumber and railroad ties; that she returned to Seattle
with a cargo of cement, arriving about June 20, 1905; that
during the voyage difficulties had arisen with her boilers,
causing them to leak; that she was not then in fit condition
to safely proceed on the contemplated voyage to Nome; that
her boilers could have been thoroughly repaired within ten
days, which would have enabled her to sail about July 1,
1905; that, instead of so repairing them, respondent, on
June 21, contracted with the Pacific Coast Company, to
carry a cargo of coal to San Francisco; that temporary
repairs, requiring about two days, were made so that the
ship might proceed to San Francisco; that while such tem-
porary repairs were being made, the vessel was being loaded
with coal, and that she went upon the San Francisco and
Seattle run where she continued for several months before
permanent repairs were made.

Respondent contended, and the trial court held, that the ex-
ception clause applied to defects that occurred after the ex-
ecution of the contract, and while the Eureka was at sea on
the San Pedro voyage. Appellant contends that the excep-
tions applied only to such perils of the sea, defects in boilers,
etc. as might occur after actual commencement of the con-
tracted voyage from Seattle to Nome. Under the law and
evidence, we conclude that appellant's contention must be

sustained. Commenting on such exceptions in a charter party contract, Carver in the fourth edition of his treatise on Carriage by Sea, at § 148, says:

"But it seems that the exceptions do not apply to matters which may happen before the ship has entered upon the voyage dealt with by the charter party. So that if she were disabled by perils of the sea while still completing a voyage on which she was engaged at the time of chartering, the shipowner would not be excused by the exceptions."

The same doctrine has in effect been announced in this country. *The Caledonia,* 157 U. S. 124; *The Carib Prince,* 170 U. S. 655; *The Indrapura,* 178 Fed. 591. Under the charter party, it was respondent's duty to have the steamship at Seattle on or about June 15, 1905, in fit condition to receive appellant's freight and carry the same to Nome. If respondent did not intend to assume liability for any possible breach of its contract that might result from accidents or injuries to the steamship during a previous voyage, it should have contracted against such liability. This it did not do. In *The Caledonia, supra,* the supreme court of the United States said:

"There was no exception in this bill of lading which in express words exempted the shipowner from furnishing a seaworthy vessel at the commencement of the voyage. As the exceptions were introduced by the shipowners themselves in their own favor, they are to be construed most strongly against them, and we perceive no reason why the obligation to furnish a seaworthy vessel should be held to have been contracted away by implication. Their meaning ought not to be extended to give the shipowner a protection, which, if intended, should have been expressed in clear terms."

In the opinion of the United States circuit court in *The Caledonia,* 43 Fed. 681, 685, Mr. Justice Gray said:

"In every contract for the carriage of goods by sea, unless otherwise expressly stipulated, there is a warranty on the part of the shipowners that the ship is seaworthy at the time of beginning her voyage, and not merely that he does

not know her to be unseaworthy, or that he has used his best efforts to make her seaworthy. The warranty is absolute that the ship is, *or shall be,* in fact seaworthy at that time, and does not depend on his knowledge or ignorance, his care or negligence."

Under the authorities, our construction of the contract is, that respondent was under an obligation to have the steamship in the port of Seattle on or about June 15, 1905, in fit condition and ready to carry appellant's freight to Nome; and that, in the absence of any express exceptions in the charter party, which would specifically apply to perils of the sea and accidents to machinery that might occur on a previous voyage, their occurrence would not relieve respondent from the obligation imposed upon it. In their brief, counsel for respondent say:

"Where a charter party provides that a vessel shall proceed to a port without cargo, or with cargo for owner's benefit, and take a cargo on board there, and then proceed on a voyage to a port of discharge, the exception of the perils of the sea and so forth includes not only the voyage with the cargo on board, but also the preliminary transit to the port of loading. *Barker v. M'Andrew,* 34 L. J. C. P. 191; 2 Asp. 205; 18 C. B. (N. S.) 759; *The Carron Park,* 15 P. D. 203; *Bruce v. Nicolopulo,* 11 Exchequer, 129. The obligation imposed by the decision in the *Caledonia* and *Carib Prince* does not attach until after the vessel has actually commenced the voyage."

An examination of the English cases which respondent's counsel thus cites will show that they are not applicable to the facts before us. In *Barker v. M'Andrew,* 34 L. J. C. P. 191, the charter party, containing the usual exceptions, stipulated that the steamer Smyrna, then at Newcastle, should with all convenient speed proceed to the usual place of loading, there load, proceed thence to Alexandria, Egypt, and there discharge the cargo on payment of the freight. It was conceded that the exceptions were available to the shipowner at all times after the voyage had commenced, but

the question to be determined was whether the voyage commenced at Newcastle where the vessel was at the date of the charter party contract, or whether it was to commence at the place of loading.  As the charter party expressly stipulated that the owner was to cause the vessel to proceed from Newcastle, it was held that the contracted voyage commenced at that place, and the exceptions were available to the owner at all times thereafter.  After the voyage from Newcastle had commenced, and after the ship had secured a portion of her cargo at the place of loading, she was hindered and prevented by dangers of the sea, then happening, from receiving and loading the remainder of the contracted cargo. This caused a delay to the damage of the charterer, but it was held that the dangers of the sea had intervened after the commencement of the voyage from Newcastle, and that under the exceptions the owner of the vessel was relieved from liability.

In *The Carron Park*, 15 P. D. 203, the syllabus, which states the substance of the opinion, reads as follows:

"By a charter party it was agreed that the defendants' steam vessel should go to New Fairwater, and there load from the agents of the plaintiffs a cargo of sugar and proceed therewith to Greenock, the defendants not to be responsible 'for any act, neglect, or default whatsoever of their servants during the said voyage.' The agents commenced loading the vessel with sugar belonging to the plaintiffs, and during the loading the cargo was damaged by water through a valve in the engine-room having been negligently left open by one of the engineers of the vessel:—

"Held, that the term 'voyage' included the period of time during which the vessel was being loaded, and that consequently the damage was within the exception and the defendants were not liable."

In *Bruce v. Nicolopulo*, 11 Exch. 129, the charter party agreement was that the owners of the ship Gipsey should proceed to Constantinople, thence to Galatz or Ibralia as ordered by the charterer's agent where she was to receive the contracted cargo, and it was held that she was on the contracted voyage from the time of leaving Constantinople.  If

the charter party now before us had stipulated that respondent should cause the steamship Eureka to proceed from San Pedro, California, to Seattle, to there load appellant's freight and proceed to Nome, and had the injuries to her boilers occurred while she was proceeding from San Pedro to Seattle, it might then be held that they had occurred after the commencement of the contracted voyage, and that they came within the exceptions. We have no such case before us; the contemplated voyage was to commence at Seattle; the injuries to the boilers occurred before its commencement, and were not within the exceptions of the contract. This being true, respondent is liable to appellant for any damages he may have sustained as the result of the breach of the contract.

Respondent contends the evidence is not sufficient to show that it knew of appellant's contract to complete the dredge at Nome on or before September 1, 1905, and that appellant's contract was not within the contemplation of the parties to the charter party when it was made. This contention cannot be sustained. Appellant's position on this issue is supported by the clear preponderance of the evidence. Appellant had entered into a prior charter party with another steamship company to carry this same freight. That contract, as respondent was then advised, was cancelled in order that appellant might contract with respondent for earlier sailings and thus save time, which was of vital importance. Appellant at the time informed respondent of his contract with the Seward Peninsular Mining Company for the building of the dredge, that he was under bond to have it completed by September 1, 1905, and that prompt delivery of the freight was of such material and vital importance as to make it the essence of the contract.

The only remaining question is the amount of damages appellant is entitled to recover. He filed a bill of particulars setting forth numerous items of damages, amounting in all to $36,333. The evidence, which is voluminous, cannot be

detailed in an opinion of reasonable length.   Were it not for
the fact that appellant's contract to complete the dredge on
,or before September 1, 1905, was within the contemplation
of the parties, when the charter party was executed, it
might be seriously questioned whether appellant could re-
cover any of the damages which he claims under the facts
shown.   We conclude he can only recover upon the first
item contained in his bill of particulars, which is based upon
his expenses incurred in retaining an idle crew of employees
during a period of delay caused by respondent's breach.   The
elementary rule for measuring damages is that compensation
only shall be made for losses actually sustained.   Ordinarily
such losses to become the basis of an award must be the direct
and proximate result of the breach of the contract, as dam-
ages of a remote or speculative character should not be al-
lowed.   In some instances, however, pecuniary losses may
arise out of special circumstances or conditions which were
within the contemplation of the parties when executing
their contract.   This is such a case, as it was comtemplated
that delays in shipment would in all probability result in
serious loss to appellant.   In the leading English case of
*Hadley v. Baxendale,* 9 Exch. 341, Alderson, B. said:

"Where two parties have made a contract which one of
them has broken, the damages which the other party ought
to receive in respect of such breach of contract should be
such as may fairly and reasonably be considered either aris-
ing naturally, i. e., according to the usual course of things,
from such breach of contract itself, or such as may reason-
ably be supposed to have been in the contemplation of both
parties, at the time they made the contract, as the probable
result of the breach of it.   Now, if the special circumstances
under which the contract was actually made were communi-
cated by the plaintiffs to the defendants, and thus known to
both parties, the damages resulting from the breach of such
a contract, which they would reasonably contemplate, would
be the amount of injury which would ordinarily follow from
a breach of contract under these special circumstances so
known and communicated."

What damages resulting to appellant could we reasonably infer were contemplated by the parties? Manifestly they would be such damages only as the delay in shipment would impose upon appellant in the completion of his contract to build the dredge. The evidence is that the second shipment was partially made on the steamship Olympia about July 26, 1905. Had respondent permanently repaired the Eureka, it could have proceeded to Nome on or about July 1st. This respondent failed to do. As a result, appellant's crew was compelled to remain idle at Nome awaiting materials necessary to proceeding with the construction of the dredge, and appellant was compelled to retain this idle crew on pay and expense, about fifteen miles from Nome, where they could obtain no other employment, and where appellant was compelled to hold them until the freight arrived.

It is shown that a delay occurred in completing the dredge, and that appellant thereafter incurred expense in collecting his final payments from the Seward Peninsular Mining Company. He has included in his bill of particulars a claim for damages on this account. We conclude, however, that, under the circumstances shown, this and other included claims are too remote and speculative to form a basis of recovery. The Seward Peninsular Mining Company did delay final payment, but it is not at all clear a like delay with resulting expense to appellant would not have occurred in any event, without regard to any wrongful act of respondent. The evidence shows that the enterprise for which the Seward Peninsular Mining Company had the dredge constructed resulted in failure; that the company nevertheless made the final payment; that it later went into the hands of a receiver; but that it could not or at least did not make the final payment until it had received the necessary funds by contribution from its stockholders and trustees. The evidence does show without dispute that, by reason of the delay in shipment, appellant's crew of twenty employees remained idle for a period of at least twenty-five days; that four teams em-

ployed by appellant remained idle the same time; that the daily wages and expenses of each man whom appellant was compelled to pay, was $7.46; that the daily cost and expense of each team was $18, and that appellant's total loss on account thereof was $5,530. This sum he is entitled to recover.

The judgment is reversed, and the cause is remanded with instructions to enter judgment in appellant's favor for $5,-530, with six per cent interest thereon from the date of the commencement of this action. Appellant will also recover his costs in the superior court and in this court.

DUNBAR, C. J., MORRIS, and ELLIS, JJ., concur.