## KALBFLEISCH CORPORATION v. UNITED STATES et al.
### No. 187.
District Court, D. Massachusetts.
Nov. 18, 1931.

Eugene P. Carver, Jr., and Carver & Schell, all of Boston, Mass., for plaintiff.

Frederick H. Tarr, U. S. Atty., and A. Chesley York, Asst. U. S. Atty., both of Boston, Mass., and Myron H. Avery, Admiralty Atty., U. S. Shipping Board, of Washington, D. C., for defendants.

BREWSTER, District Judge.

This is an admiralty proceeding, brought against the United States of America, to recover damages to a cargo of casein which was received at Buenos Aires on board the steamship Culberson, for shipment to Boston.

### Findings of Fact.

On the 20th day of June, 1928, 834 bags of casein, in apparent good order and condition, were taken on the steamship Culberson at Buenos Aires, to be transported to Boston, and a bill of lading in the usual form was issued therefor by the American Republics Line.

By the terms of the bill of lading the company was relieved from all responsibility for damage occasioned by any of a long list of excepted causes, including damage by sea water, wetting, any "latent defect in hull, machinery * * * appurtenances or gear or unseaworthiness of any kind, whether existing at the time of shipment or at the beginning of the voyage, faults, errors or omissions in the navigation or manage-ment of the vessel, whether by the Company's employees or pilots or others, provided that due diligence shall have been exercised to make the vessel * * * seaworthy and properly manned, equipped and supplied."

When the Culberson arrived at Boston, it was found that 117 bags of casein had been damaged by sea water. The casein had been stowed in No. 5 'tween-deck, the damaged bags being at the forward end of the compartment between the forward bulkhead and the hatch. It appeared that on the evening of the 3d day of July, 1928, one of the crew discovered that there was water in the No. 5 'tween-deck. The captain and one of the officers went down to investigate and discovered that sea water was coming through a hole in a discharge pipe that ran from the firemen's toilet located on the main deck over the No. 5 'tween-deck on the port side. The water was immediately turned off, and the crew set to work bailing out the accumulation of water in the 'tween-deck and doing whatever was possible to minimize the extent of the damage to the casein and other cargo in the same compartment.

The hole had been punctured in this discharge pipe by one of the crew in an attempt to clear the discharge pipe. The circumstances were these:

On the morning of July 3, it was noticed that one of the bowls in the toilet was overflowing, and a "wiper" was given the task of clearing away the obstruction. In the performance of this work he rammed a long piece of iron pipe, about an inch in diameter, down through the discharge pipe, and in so doing punctured a hole about three-fourths of an inch wide and two inches long in the lead bend in that part of the discharge pipe which ran below the floor of the main deck and through the 'tween-deck compartment to the side of the vessel. This lead bend which was thus punctured was about 7½ feet forward of the aft bulkhead on the port side. There was a continuous flow of sea water through these toilets under a pressure of 25–30 pounds, and the water coming through the hole in the pipe fell upon or around bags of quebracho which had been stowed in the after part of the compartment. To prevent these bags from sticking together, they had been separated by thin layers of sawdust.

The hole in the discharge pipe was not discovered until evening, and in the meantime water had come into No. 5 'tween-deck, so that by 8 o'clock in the evening a con-

siderable quantity of water had accumulated therein. There was a sheer in the 'tween-deck which would cause the water to flow toward the forward end, and, when the leak was first discovered, water was flowing over the hatch coaming down into the hold. The hatch coaming was about 3½ inches high. Near the forward bulkhead the water was deep enough to reach the bags of casein which had been properly stowed on two layers of dunnage placed crosswise. There were four scuppers, one at each corner of the compartment. These scuppers were about 3 inches in diameter and were protected by grids of the crossbar type with four openings into the pipe.

When the vessel arrived at Boston, it was found that one of the forward scuppers on the port side was clogged with particles of rust, paint chippings, and sawdust which had been washed away from the bags of quebracho. The other scuppers were found to be clear.

I find that, before this casein was received on board, all the holds had been thoroughly cleaned and inspected, that No. 5 bilges had been cleaned, inspected, and passed by the chief engineer and mate on June 13, and entries to that effect had been duly made on the log book. The second mate, who had charge of No. 5 hold, testified that before the cargo was stowed therein he had cleaned and inspected No. 5 'tween-deck, that he had found small pools of rainwater in the forward part of the deck, which he had caused to be swept out through the scuppers, and that he observed no indication that the water did not flow freely through the scupper pipes.

I find that the facilities for draining the compartment in which the damaged casein had been stowed were adequate to meet any conditions reasonably to be expected of them, and that there were no faults in the construction, design, and location of the toilet discharge pipes or the scuppers, and that there were no defects, latent or patent, either in the toilet system or the scuppers.

The bill of lading contained the following provisions: "In case of any loss or damage for which the Company shall be liable, the Company shall to the extent of such liability have the full benefit of any insurance that may have been effected upon the goods or against said loss or damage, and as well also of any payment to insured by underwriters repayable only out of recovery against the Company, notwithstanding the underwriters are not obligated to make such payment."

The libelant carried insurance, the policy containing the following clause: "This insurance warranted to be in all cases null and void to the extent of any insurance by any carrier or bailee which would attach and cover said property if this policy had not been issued, and to be null and void as concerns loss or damage by fire on land to the extent of any insurance against loss or damage by fire, directly or indirectly covering upon the same property, whether prior or subsequent hereto in date, and it is also understood and agreed, that in case any agreement be made or accepted by the assured with any carrier or bailee by which it is stipulated that such or any carrier or bailee shall have, in case of any loss for which he may be liable, the benefit of this insurance, or exemption in any manner from responsibility grounded on the fact of this insurance, then and in that event the insurers shall be discharged of any liability for such loss hereunder, but this policy in these and all cases of loss or damage by perils insured against shall be liable and owe actual payment for (only) what cannot be collected from carrier and/or bailees and/or insurers of property lost or damaged, but also shall be chargeable with the direct pecuniary consequence to the assured temporarily arising from delay in collection from said carrier and/or bailees and/or insurers, and the advancing for this purpose only of funds to the assured for his protection pending such delay shall in no case be considered as affecting the question of the final liability of this insurance, and as soon as collection is made from the carrier and/or bailees and/or insurers, the title of the assured to hold the sums so advanced by the insurer shall discontinue, and a portion thereof equal to the sum collected from the carrier and/or bailees and/or insurers shall be repaid to the insurer, but in case of final failure to collect from the carrier and/or bailees and/or insurers, a portion of the sums advanced by the insurers, equal to the sum short collected from the carrier and/or bailees and/or insurers may be retained and applied in settlement of the actual liability of this insurance thereby established (provided always the loss shall constitute in other respects a claim under this insurance). In the event of loss or damage this policy shall be null and void to the extent of any payment made by any carrier or bailees or insurers whether liable or not."

I find that due notice of the claim for damages was given to the managing agent who signed a waiver of the six months' limitation with respect to bringing suit.

## Conclusions of Law.

We have a case here where merchandise received for transportation was damaged by sea water which found its way into the compartment where the merchandise was stowed, and the evidence leaves no doubt as to how this sea water happened to come in contact with the bags of casein. The libelee relies upon the terms of the bill of lading, above quoted, and also on the Harter Act (46 USCA §§ 190–195). Section 3 of the Harter Act (46 USCA § 192) relieves the vessel or her owners from all responsibility for damage to her cargo resulting from "faults or errors in navigation or in the management of" the vessel, provided the owner has exercised "due diligence to make the said vessel in all respects seaworthy and properly manned, equipped, and supplied." It is an established doctrine that a shipowner, in order to enjoy the benefits of this act, must assume the burden of establishing the seaworthiness of the vessel at the time of the beginning of the voyage, or that due diligence had been used to make her seaworthy. International Navigation Co. v. Farr & Bailey Mfg. Co., 181 U. S. 218, 21 S. Ct. 591, 45 L. Ed. 830; Martin v. The Southwark, 191 U. S. 1, 24 S. Ct. 1, 48 L. Ed. 65; W. J. McCahan Sugar Ref. Co. v. The Wildcroft, 201 U. S. 378, 26 S. Ct. 467, 50 L. Ed. 794. And this burden includes the obligation to show that due and proper inspection had been had and the vessel ascertained to be in all respects seaworthy and fit to carry the cargo which she had undertaken to deliver, or that due diligence had been used to that end. McCahan v. The Wildcroft, supra. The test of seaworthiness is whether the vessel is reasonably fit to carry the cargo which she has undertaken to transport. Martin v. The Southwark, supra; The Silvia, 171 U. S. 462, 19 S. Ct. 7, 43 L. Ed. 241.

I do not understand it to be seriously contended that the act of the wiper in forcing an opening in the lead bend, while attempting to remove obstructions in the discharge pipe under the firemen's toilet, was not an act performed in the management of said vessel or that the Harter Act would not relieve the owner from all liability for the consequences of such negligence. It is the contention of the libelant that this negligent act of the wiper was not the sole proximate cause of the damage, but that the real cause was the failure to exercise due diligence in providing adequate drainage. This want of due diligence, as the libelant alleges, is to be found in the failure of the company to properly inspect and clean the scuppers before the voyage began. I am unable to adopt the libelant's contention in this regard. Not only have I found as a fact that there was proper inspection and cleaning, but I am satisfied from the evidence that the accumulation of matter over one of the scuppers was due to the fact that the water loosened the sawdust, which eventually resulted in blocking up one of the four scuppers, that this all happened during the voyage and was a result which could not be attributable in any way to the unseaworthiness of the vessel, or any want of diligence on the part of the owner. It seems to me that this case is on all fours with The Carisbrook (D. C.) 247 F. 583, where Judge Hale decided that the evidence amply sustained the burden of proof which must be assumed by a shipowner who seeks to take advantage of the Harter Act. The evidence of the libelee, tending to show that due diligence was exercised, is not met or weakened by the fact that water accumulated in the 'tween-deck to a sufficient depth to reach the bags of casein. It must be borne in mind that for nearly ten hours water was coming through the hole in the lead bend under pressure and onto a sticky substance covered with sawdust. It is not to be inferred from the fact that, upon arrival at Boston several days later, one only of the scuppers was clogged with sawdust and particles of rust and paint, that the accumulation of water on the deck was due to insufficient drainage or that the deck was not put in a reasonably proper condition to receive the cargo at the beginning of the voyage.

My conclusion, therefore, is that the libelee has fully sustained its burden of showing that the owner exercised due diligence to make the Culberson in all respects seaworthy, and that she was properly manned, equipped, and supplied, with the result that the provisions of the Harter Act exonerate the libelees from all liability.

Having found no liability, it is not necessary to consider the legal effect of the provisions of the bill of lading and of the clauses in the policy of insurance quoted above.

The libel may be dismissed.