A. A. SCHADE, doing business as Schade & Company, Libelant,

v.

NATIONAL SURETY CORPORATION and Continental Insurance Company, Respondents.

United States District Court
S. D. New York.
March 22, 1960.

Hills, Betts & Nash, New York City, for libelant (Donald B. Allen, New York City, of counsel).

Hill, Rivkins, Middleton, Louis & Warburton, New York City, for respondents; (J. Edwin Carey, New York City, Alan S. Loesberg, New York City, of counsel).

MURPHY, District Judge.

This is a proceeding in the admiralty, by the General Average Adjuster on behalf of the hull underwriters and on his own behalf against the cargo underwriters to recover contribution in general average. Respondents' underwriters contest the validity and propriety of the claimed general average, the computations thereof, and their liability under general average guarantees issued in consideration of delivery of the cargo.

On April 23, 1953, the M/V Manabi left Tampa, Florida, with a cargo of cigarettes bound for Guayaquil, Ecuador. The following day, water was flooding the engine rooms through a hole about eight inches long and two inches wide, in the forward starboard side of the hull, at a point about five feet below the water line and, in danger of sinking, she was deliberately grounded off Cape San Antonio, Cuba, in order to preserve the cargo and to permit possible salvage of the ship and cargo.

Subsequently the cargo was transferred to another ship and delivered to destination. The vessel was thereafter declared a total constructive loss and the owner collected 80% to 90% on its hull insurance claim.

The bills of lading covering the cargo contained the following provisions, inter alia:

"General Average shall be payable according to Rules 1 to 15, inclusive, and 17 to 22, inclusive, York-Antwerp Rules, 1924, and as to the matters not therein provided for, according to the laws and usages of and to be stated at the port of New York or, at shipowner's option, the port of lading or discharge in the United States. If the shipowner shall have exercised due diligence to make the vessel in all respects seaworthy and to have her properly manned, equipped and supplied, it is hereby agreed that in case of danger, damage or disaster resulting from fault or error in navigation or in the management of the vessel or from any latent or other defect in the vessel, her machinery and appurtenances, or from unseaworthiness, although existing at time of shipment, or at the beginning of the voyage (provided the defect or unseaworthiness was not discoverable by the exercise of due diligence), the shippers, consignees and/or owners of the cargo shall nevertheless pay salvage and any special charges incurred in respect of the cargo and shall contribute with the shipowners in general average to the payment of any sacrifice, losses or expenses of a general average nature that may be made or incurred for the common benefit or to relieve the adventure from any common peril.

"This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of any of its right or immunity or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading is repugnant to said Act to any extent, such term shall be void to that extent, but no further."

Accordingly, under the bill of lading and the Carriage of Goods by Sea Act (46 U.S.C.A. § 1300 et seq.) the shipowner would not be liable for loss resulting from unseaworthiness unless caused by want of due diligence to make the ship seaworthy. And freedom from such liability is a prerequisite to the shipowner's right to general average contribution, the burden being upon such owner to prove it, as libelant readily concedes.

There appears to be no dispute over the propriety of the deliberate grounding. The primary dispute relates to whether or no the vessel owner had exercised due diligence to make the vessel seaworthy at the commencement of the voyage, and incident thereto, dispute as to the cause of the holing.

The Manabi was built for the Navy in 1942 and had been converted into a dry cargo ship. Its dimensions were 184 feet six inches in length; 32 feet two inches beam; 14 feet eight inches depth. Its gross tonnage was 1,083 with a net of 882. It had diesel power and twin screws.

It is undisputed that the inspection or examination of the ship prior to its leaving Tampa consisted of an examination of the engines and refrigerating equipment, and as to the remainder of the vessel, merely a visual and cursory inspection. This was the "usual routine inspection" according to the port engineer, Jankovich. About eleven months prior thereto, in May 1952, the Manabi had been dry-docked and surveyed for classification purposes. At that time, though no repairs were made, the hull was thoroughly inspected and hammer tested, according to libelant's witnesses. It also appeared that some time in 1951 the vessel was in dry-dock, at which time considerable replating of the hull was done, at least with respect to the bottom plates. This replating it seems was necessitated by two groundings earlier in 1951. It should be further noted that subsequent to the last dry-docking in May 1952 the Manabi either went

aground or struck the side of a lock in the Panama Canal. According to libelant's testimony (the log books were not produced and their unavailability rather lamely explained) a diver was put down shortly thereafter but was unable to find any damage, and at the same time the ship's officers made a thorough examination inside the vessel which likewise proved negative.

As to the weather conditions obtaining on the ill-fated voyage, the evidence such as it is, including answers to interrogatories, shows that the wind was from the E.N.E., regular trade winds of about force 4 to 5 on the Beaufort scale, i. e., 13 to 24 miles per hour. Further, the captain of the Manabi testified that they encountered "heavy weather"—that the vessel "was rolling and pitching a little bit." In sum, the weather apparently was by no means unusual, unexpected, extraordinary or catastrophic, and was no more than what might reasonably have been anticipated and withstood by a seaworthy ship.

The testimony adduced as to the characteristics of the hole was so meager that we are unable to determine the nature of its cause, whether it be due to an external force, corrosion, wear, or imperfection in the metal itself. We therefore make no finding in that regard.

By way of possible explanation of the holing, witness Hallbauer suggested four: (1) punched in by outside force; (2) fell out through deterioration; (3) deliberate act of someone on the vessel; and (4) bilge keel ripped away and tore hole in the plate with it. The fourth is libelant's main contention. All four are mere guesses. As to the first three there is absolutely no evidence offered in their support. The last possibility is the most reasonable and the most controverted. At least Hallbauer testified that in his capacity as marine surveyor he has seen the same type vessel as the Manabi (sister ships) with similar bilge keels torn away. More important, he saw the Manabi with that very same damage on a prior occasion.

The controversy aforementioned centered about whether or not the Manabi's bilge keels had been cut back beyond the area of the hole prior to sailing in April, 1953. Without getting into an extended discussion on this point, which we deem unnecessary, we find simply that the keels had not been so cut back, and were present in place in the way of the hole at the time it left Tampa. While we would perhaps favor the theory that the bilge keel ripped away and tore the hole with it, we deem it unnecessary to make a finding as to the exact cause—or to determine fault affirmatively—for we hold that the burden of due diligence has not been carried. Cf. The Southwark, 191 U.S. 1, 24 S.Ct. 1, 48 L.Ed. 65.

Under the circumstances present here, to wit, that no inspection at all was made at the commencement of the trip except as to the engines; that no officer or crew member reported any facts tending to show that the Manabi struck some floating or submerged object en route; that no extraordinary weather conditions were encountered; that the log books were not produced; that the explanations offered to account for the holing are all bottomed on conjecture; that the last practical examination and testing of the hull plates was nearly a year before the final voyage and that subsequent to that examination the Manabi did go aground (or strike the lock side), however insignificant it may have appeared at the time; and finally that this crippling occurred just about a day after sailing—with all these facts considered we find it a reasonable inference that the Manabi was unseaworthy at the commencement of the voyage, and we so find. Further, since it is impossible for us to conclude otherwise than that the vessel owner did not exercise due diligence to render the ship seaworthy prior to sailing, we are constrained also to hold, in the absence of evidence to indicate a latent defect, that it is at the very least doubtful that the condition or defect, which we have presumed existed at the start, could not have been discovered by

the exercise of due diligence. Since the question remains in doubt, obviously libelant has not sustained the burden prerequisite to general average contribution. Cf. Commercial Molasses Corp. v. New York Tank Barge Corp., 314 U.S. 104, 62 S.Ct. 156, 86 L.Ed. 89; Artemis Maritime Co. v. Southwestern Sugar & Molasses Co., 4 Cir., 1951, 189 F.2d 488; Waterman S. S. Corp. v. United States S. R. & M. Co., 5 Cir., 1946, 155 F.2d 687; Metropolitan Coal Co. v. Howard, 2 Cir., 1946, 155 F.2d 780; Ore Steamship Corp. v. D/S A/S Hassel, 2 Cir., 1943, 137 F.2d 326; General Motors Corp. v. The Olancho, D.C.S.D.N.Y.1953, 115 F.Supp. 107; Standard Oil Co. v. Anglo-Mexican Petroleum Corp., D.C.S. D.N.Y.1953, 112 F.Supp. 630; The Vizcaya, D.C.E.D.Penn.1945, 63 F.Supp. 898.

Libel dismissed.

This memorandum is filed in lieu of findings of fact and conclusions of law.