**E. H. WINN, Jr. and Betty Lee Jones Winn, Petitioners-Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

No. 77–1939.

United States Court of Appeals, Fifth Circuit.

May 23, 1979.

---

* Senior Judge of the United States Court of Claims, sitting by designation.

Charles L. Brocato, Jackson, Miss., for petitioners-appellants.

Myron C. Baum, Acting Asst. Atty. Gen., Tax Div., Gilbert E. Andrews, Acting Chief, App. Section, U. S. Dept. of Justice, Charles L. Saunders, Acting Chief Counsel, Internal Revenue Service, Washington, D. C., Leon G. Wigrizer, Acting Chief Counsel, M. Carr Ferguson, Asst. Atty. Gen., Tax Div., Michael L. Paup, Aaron P. Rosenfeld, Attys., Dept. of Justice, Washington, D. C., for respondent-appellee.

Before THORNBERRY, CLARK and RONEY, Circuit Judges.

CHARLES CLARK, Circuit Judge:

This case presents two unrelated questions of construction of the federal income tax law. The first requires that we interpret the term "passive investment income" in order to determine whether a taxpayer qualified for small business corporation, or "Subchapter S," tax treatment under 26 U.S.C.A. § 1372 (Internal Revenue Code § 1372). The second involves examination of a claimed deduction for a charitable contribution under 26 U.S.C.A. § 170(c) (Internal Revenue Code § 170(c)).

The facts are basically undisputed. The taxpayers, E. H. Winn, Jr., and Betty Lee Jones Winn, husband and wife, filed joint tax returns for the years in question and claimed deductions for losses from a corporation which had elected "Subchapter S" treatment, Wagren Barge Company, and for a charitable contribution made to a Presbyterian missionary. Winn was two-thirds owner of Wagren Barge Company and its related companies, Security Barge Lines, Security Towing Company, WFK

Towing Company, Wagren Steel Company, and Greenville Marine Services, Inc. All were separately incorporated but shared the same stockholders, boards of directors, and office space. They operated as an integrated water transportation system which ran an affreightment service for dry-bulk commodities on United States inland waterways.

Security Barge Lines operated and supervised the system. It actively solicited customers and used the available barges and other equipment of the related corporations to fill the "contracts of affreightment," or agreements under which the commodities were to be hauled. Income and expenses for each job were assigned by Security to the related corporation supplying the equipment or performing the required services. As part of this system Wagren maintained cross-charter arrangements to rent its barges to Security when needed or to rent them to unrelated barge companies under Wagren's own contracts.

Such agreements, known as charter parties, can embody various degrees of obligation on the part of the owner. For instance, in a "fully found" charter, the owner delivers the equipment fully manned, supplied and equipped, and able to perform a particular job for the charterer. In contrast, Wagren chartered barges having no equipment or crew on a "bareboat" basis. Under this arrangement, complete control and possession of the vessel is turned over to the charterer; the owner is obligated only to supply the barge in a seaworthy condition. The charterer receives merely the right to utilize a particular barge. The owner does not provide affreightment services, such as moving the barge to the desired port for loading, arranging for towing and tug services, or barge cleaning. Performance of these latter services, which relate to the transportation of cargo, earns a carrier "affreightment income." Income received by an owner for bareboat chartering, however, is called "barge charter income."

For the taxable years in question, 1968 and 1969, Wagren received barge charter income for bareboat charter parties with its sister corporation, Security, largely through inter-company accounts, but also from bareboat charters to unrelated companies. Wagren's barge charter income for the relevant years constituted more than 20 percent of its gross receipts. During these taxable years, the Winns elected to treat Wagren as a Subchapter S corporation in order to take advantage of certain investment tax credits.

 An election under Subchapter S terminates if the electing corporation has "passive investment income" in excess of 20 percent of its gross receipts. 26 U.S.C.A. § 1372(e)(5) (Internal Revenue Code § 1372(e)(5)).[1] The statute specifically defines rents as one variety of "passive investment income." The tax court found that Wagren's "barge charter income" constituted "passive investment income," and therefore that the company was not entitled to Subchapter S treatment. We agree.

Winn argues that the barge charter income was earned by Wagren as part of an active business endeavor rather than a passive investment. Thus he says Wagren has earned no "passive investment income." His reasoning is based upon *House v. C. I. R.,* 451 F.2d 982 (5th Cir. 1972), which in-

---

1. 26 U.S.C.A. § 1372(e)(5) provides in relevant part:

*PASSIVE INVESTMENT INCOME.*

(A) Except as provided in subparagraph (B) [not applicable here], an lection under subsection (a) made by a small business corporation shall terminate if, for any taxable year of the corporation for which the election is in effect, such corporation has gross receipts more than 20 percent of which is passive investment income. Such termination shall be effective for the taxable year of the corporation in which it has gross receipts of such amount, and for all succeeding taxable years of the corporation.

\* \* \* \* \* \*

(C) For purposes of this paragraph, the term "passive investment income" means gross receipts derived from royalties, rents, dividends, interest, annuities, and sales or exchanges of stock or securities (gross receipts from such sales or exchanges being taken into account for purposes of this paragraph only to the extent to gains therefrom).

volved related Subchapter S corporations engaged in the business of lending money. *House* interpreted the predecessor of the present § 1372(e)(5). At the time *House* arose, this statute provided for termination of Subchapter S status if more than 20 percent of the corporation's gross income came from "personal holding company income," which the section defined to include interest.[2] Finding that 26 U.S.C.A. § 542 (Internal Revenue Code § 542) expressly exempted business active companies of the type before it from the statutory definition of "personal holding companies," *House* held that interest received by the companies which were not personal holding companies under § 542 could not be "personal holding company income." The court reasoned that "interest" in § 1372(e)(5) should not be read in isolation from its source. Thus, even though the involved corporations received more than 20 percent of their income in the form of interest, *House* held that because the corporations were not personal holding companies they did not lose their Subchapter S status.

Wagren can point to no statutory provision similar to the definition section found to be pertinent in *House* which would take its barge charter income out of the § 1372(e)(5) classification of "passive investment income." In fact, § 1372(e)(5)(C) now

defines that term as "rents" and without more, Wagren's barge charter income would be "rents."[3] But there is more. Treasury Regulation § 1.1372–4(b)(5)(vi) defines "rents" as:

> amounts received for the use of, or right to use, property (whether real or personal) of the corporation . . . . Payments for the warehousing of goods or for the use of personal property do not constitute rents if significant services are rendered in connection with such payments.

Since barges are personal property, the question for this case becomes whether Wagren rendered "significant services" in connection with its barge charter income. We took the same approach in *Bramlette Building Corp. v. Commissioner*, 424 F.2d 751 (5th Cir. 1970), which was decided before *House*.

We recognize that the rendition of significant services would mean that a corporation receiving rent was not receiving passive investment income, and that the analytical approach of testing the "significant services" requirement of the regulation's definition of "rents" becomes the analogue of *House's* incorporation of § 542's definition of "personal holding company" in "interest" under old § 1372(e)(5). However, it

---

**2.** The earlier statutory language provided:

(5) *Personal holding company income.*

An election under subsection (a) made by a small business corporation shall terminate if, for any taxable year of the corporation for which the election is in effect, such corporation has gross receipts more than 20 percent of which is derived from royalties, rents, dividends, interest, annuities, and sales or exchanges of stock or securities (gross receipts from such sales or exchanges being taken into account for purposes of this paragraph only to the extent of gains therefrom). Such termination shall be effective for the taxable year of the corporation in which it has gross receipts of such amount, and for all succeeding taxable years of the corporation.

**3.** Other courts have distinguished *House* when applying the post-amendment termination provision. In *Zychinski v. Commissioner*, 506 F.2d 637 (8th Cir. 1974), *cert. denied*, 421 U.S. 999, 95 S.Ct. 2397, 44 L.Ed.2d 666 (1975), the Eighth Circuit rejected the rule (proposed by Winn

here) that all income from an actively conducted business is immune from Subchapter S termination provisions. It reasoned that the plain meaning of the definitional language in amended section 1372(e)(5)(C) clearly disposed of any need to examine the corporation's activities to determine the nature of the income. Because Congress defined exactly what income was "passive investment income" in that section, *Zychinski* held it was not set to the task of determining whether a business is sufficiently "active" to warrant Subchapter S treatment. Later, in *Doehring v. CIR*, 527 F.2d 945 (8th Cir. 1975), the Eighth Circuit reaffirmed its reasoning in *Zychinski* regarding post-amendment deficiencies. The Tenth Circuit also distinguished *House* in *Marshall v. Commissioner*, 510 F.2d 259 (10th Cir. 1975), by the change in statutory language and read section 1372(e)(5)(C) as enumerating *per se* forms of "passive investment income."

is the regulation which compels the result in this case and not the rationale of *House.*

In an attempt to portray Wagren's barge charter business as involving the rendition of "significant services" Winn set out these company activities conducted in connection with the bareboat charters: establishment and maintenance of seaworthiness, general repair and maintenance of barges, dockage when not in use, delivery of barges to sites where needed, management of seaworthiness, general repair and maintenance of barges, dockage when not in use, delivery of barges to sites where needed, management decisions and cross-charter arrangements. The tax court reviewed each activity individually and concluded: "By any test of 'significance,' no significant services were performed by Wagren in connection with its 'barge charter income.'" We agree.

■ Under maritime law, barge owners have an implied duty to furnish their vessels in a seaworthy condition. *The Southwark,* 191 U.S. 1, 24 S.Ct. 1, 48 L.Ed. 65 (1903); *Church Cooperage Co. v. Pinkney,* 170 F. 266 (2d Cir.), *cert. denied,* 214 U.S. 526, 29 S.Ct. 704, 53 L.Ed. 1068 (1909). But merely proving compliance with this duty whether imposed by law or contract does not establish that Wagren has rendered any significant service. Maintenance and general repair, on the other hand, may amount to the sort of rental activity which would fulfill the intent of the regulation. Such is not the case here, as the tax court found, since, as a percentage of the total barge charter income recorded by Wagren, the total costs claimed for cleaning and barge repairs were insignificant. Furthermore, as to all items of service enumerated by Winn, the tax court determined that arrangements for such services made in connection with Wagren barge rentals were made by Security or at its direction:

> Policy directions for the combined group of affiliated corporations were issued by [Winn or his associate] but there is no evidence to indicate when, if ever, they were acting in their capacity as officers and employees of Wagren. The income earned and expense incurred by Wagren amounted to little more than inter-company book allocations made at the direction of [Winn] and other employees of Security.

To comply with the regulations, a corporation must actively engage in the production of rentals; it must provide or make arrangements for significant services. Herein, the services provided or arranged for by Security cannot be attributed to Wagren. Significant services within the meaning of the regulations must be rendered by the corporation seeking to qualify under Subchapter S. *See Bramlette Building Corp. v. Commissioner, supra.*

It is true that Wagren maintained cross-charter arrangements with other non-affiliated corporations. However, the evidence produced did not establish that a significant portion of Wagren's barge charter income was attributable to these agreements.

Winn argues that this integrated water transportation system is operated by such closely related corporations that they are not amenable to individual scrutiny and are therefore not capable of "renting" equipment among themselves. This contention is without merit. Wagren is before this court as an independent corporation on the question of its sole tax status. The individual corporations in the Security family each had separate corporate entities, kept individual records, and purported to deal with each other as discrete businesses.

We also reject Winn's argument that barge charter agreements are governed by admiralty law and thus should not be held to the same standards as general rents. *See United States v. Shea,* 152 U.S. 178, 14 S.Ct. 519, 38 L.Ed. 403 (1894).

Since all of the functions of Wagren's business which could have amounted to significant rental services rendered were provided by Security, Wagren's barge charter income does not come within the exclusion

of the regulation. Therefore, Wagren's rental income terminated its Subchapter S election, and the Winns are not entitled to its investment tax credit.

The Tax Court denied the Winns claimed deduction in 1967 for a $10,000 check payable to the "Sara Barry Fund" to support Presbyterian mission work in Korea. Barry's work on the foreign field was sponsored by the Benoit Presbyterian Church, the First Presbyterian Church of Greenville, Mississippi and by a Presbyterian church in Chattanooga, Tennessee. In order to solicit contributions from community members to support her mission work, the Benoit Presbyterian Church sponsored several "Sara Barry Days." Contributions received on these "Days" were channeled by Sara Barry's father, an elder in the Benoit Church, into her personal bank account in Benoit. Although the Winns had previously made occasional contributions to their local Presbyterian church in Greenville, Mississippi, in this instance they made their contribution directly to the Sara Barry Fund to prevent the Greenville church from using a part of the contribution for work of the World Council of Churches, a purpose the Winns did not support. Sara Barry is Mr. Winn's first cousin. The check was endorsed "For Deposit Sara Barry Fund," was deposited in Barry's personal account in Benoit, and was in fact used for Korean mission work.

Section 170(c) of the Internal Revenue Code permits a taxpayer to deduct a contribution or gift "to or for the use of" a qualified charity. The tax court disallowed Winn's deduction under this section because it found that the Presbyterian churches, which were qualified charities, never received or had the use of the $10,000. The taxpayers, however, argue that the funds were actually given in a church-sponsored program and used in church-sponsored work and therefore were made "for the use of" that donee. The Winns rely on *Bauer v. United States*, 449 F.Supp. 755 (W.D.La. 1978), as authority for the proposition that donations ultimately used for charitable purposes are in fact made "for the use of" a charitable institution. *Bauer* held that a charity need not have full control of the donated funds to satisfy that test. The taxpayers in *Bauer* were permitted to deduct scholarship funds given to selected individual students attending qualified educational institutions. *See also Sisco Foundation v. United States*, 295 F.2d 924 (Ct.Cl. 1961); *Morey v. Riddell*, 205 F.Supp. 918 (S.D.Calif.1962). We also note that a donor can earmark a contribution given to a qualified organization for specific purposes without losing the right to claim a charitable deduction. *See Phinney v. Dougherty*, 307 F.2d 357 (5th Cir. 1962). Such a contribution still would be "to or for the use of" a charitable entity despite the fact that the donor controlled which of the qualified entity's charitable purposes would receive the exclusive benefit of the gift.

Proof that the church in Benoit sponsored "Sara Barry Days" for the express purpose of collecting funds for this part of its work, that an officer of that church took the funds donated and dealt with them as the church wished, and that the funds went to the support of the work the church intended is sufficient to establish that the funds were donated for the use of the Benoit Presbyterian church. The tax court's contrary legal conclusion based on these undisputed facts is reversed.

AFFIRMED IN PART, REVERSED IN PART.