Petition of RELIANCE MARINE TRANSP. & CONST. CORP.

THE M. J. WOODS.

Nos. 237–239, Dockets 22654–22656.

United States Court of Appeals Second Circuit.

Argued May 8, 1953.

Decided Aug. 7, 1953.

Macklin, Speer, Hanan & McKernan, New York City, Leo F. Hanan, New York City, of counsel, for appellee.

Mahar & Mason, New York City, Frank C. Mason, New York City, of counsel, for petitioner-libellant-appellant.

Hill, Rivkins & Middleton, New York City, Thomas H. Middleton, and John J. Killea, New York City, for libellant Olds & Whipple, Inc.

Before L. HAND, CHASE and CLARK, Circuit Judges.

CHASE, Circuit Judge.

In January, 1948, Olds & Whipple, Inc., made an oral contract with James McWilliams Blue Line Inc., to be hereafter called the carrier, under which the latter agreed to transport by water carriage 900 tons of superphosphate from Carteret, N. J., to New Haven, Conn. The carriage was to be in accordance with the terms of the carrier's printed freight tariff effective November 27, 1946, with which both parties were familiar and which provided that carriage

thereunder was subject to the provisions of the Harter Act and to those of the Carriage of Goods by Sea Act of 1936.

The carrier orally chartered the barge M. J. Woods, to use in carrying out this carriage contract, of its owner the Reliance Marine Transportation and Construction Corporation, to be called hereinafter Reliance, and the barge with its bargee aboard was delivered to the carrier by Reliance for such use.

The barge, without having been inspected by the carrier, was loaded with the cargo and towed to the carrier's stakeboat in New Haven Harbor by the carrier's tug Skipper, arriving there on the morning of January 30, 1948. As soon as it was moored to the stakeboat, it was noticed that it was sinking. It was at once cut loose and pushed by the tug toward shallow water but sank where it was some five feet below the surface at low tide and both it and cargo were abandoned.

Reliance petitioned for exoneration or limitation of liability and carrier and cargo filed claims in that proceeding. It also filed a libel against the Skipper alleging that its negligent towing caused the loss of the barge. Cargo sued the carrier, the tug and the barge for the loss of the cargo. All three proceedings were consolidated for trial. It was found that the unseaworthiness of the barge when delivered to the carrier was the cause of its sinking; that the carrier did not exercise due diligence to discover its unseaworthiness or to make it seaworthy and that neither the carrier nor the tug were negligent.

The interlocutory decrees held Reliance directly liable to cargo because of the unseaworthiness of the barge but with the right of limitation. For the cargo loss caused by the unseaworthy barge, the carrier was held liable to cargo for the full amount of its damages with right of recovery over from Reliance, without limitation, because of the latter's breach of its personal warranty of the seaworthiness of the barge; the libels against the tug were dismissed. The appeal is by Reliance alone.

■ The first question is whether the finding that the barge was unseaworthy when delivered to the carrier is "clearly erroneous." On the voyage from Carteret to New Haven nothing extraordinary happened although there was a delay of about thirteen hours at Norwalk, Conn., because of inclement weather. The cargo was well within the capacity of the barge which had a freeboard of about five feet and the stowage was proper. There is nothing in the record to show that up to the time of her entry into the harbor at New Haven the barge had not been able to perform her part of the carriage adequately. There was broken ice in the harbor but no heavier than was to be expected there in January; and the ice in the main channel through which the barge, which had no iron sheathing for protection against ice, was towed to the stakeboat had been broken previously that day by tugs with tows and one tug had broken the ice between the main channel and the stakeboat. Just before the barge was taken to the stakeboat a tug had picked up a barge moored there and had circled the stakeboat in so doing. It was found that, "On entering the harbor, the tug shortened its line and brought the barge in to the stakeboat on a short hawser from her stern bit to the mid-bow bit of the barge carefully and without incident, in quiet water by a course largely free from solid ice." This was based on the evidence of the captain of the tug, a deckhand, and the captain of the stakeboat. The bargee testified to the contrary that the barge was made fast alongside the tug to starboard and was brought violently against solid ice. As the finding, thus made on conflicting evidence, was supported by the testimony of witnesses seen and heard by the trial judge and its correctness depends upon their credibility we accept it.

Reliance had an examination of the barge made by a diver not long after the sinking but his report was not introduced in evidence. About six months after the barge sank another diver made an examination of her planking, except on the bottom, and found two holes, which could have been the cause of the sinking, near her water line as it was when she was brought into the harbor. There were parts of planks missing. During the six months following the sink-

ing and before the diver who reported the holes made his examination, pontoons used in dredging had been moored near the barge and it is possible that the missing planks were torn off by them as the judge pointed out but his further comment that "one would expect that damage from ice would result in planks stove in rather than in lengths of plank completely missing" seems of little significance since they might have been stove in and also be loosened so that they were carried away. And, of course, if hitting ice was in fact what tore them off that might have occurred when the attempt to beach the barge was made. Their absence no doubt would have justified an inference that they had been lost before the barge was moored at the stakeboat had the evidence of the bargee as to the towing of the barge against solid ice in bringing her up to the stakeboat been believed. But, without that, such an inference was not the only justifiable one. The trial judge pointed out other possible ways in which the holes could have been made and did not find how, or where, or when they were made.

Assuming, *arguendo*, that they were made by ice hitting the planks before the barge was moored at the stakeboat, and that would account for her starting to sink as she did, the evidence supported findings that the barge was being towed carefully in quiet waters in which the ice was such as was to be expected warrant the inference drawn by the judge that she was unseaworthy when delivered to the carrier for she should have been so strong and staunch as to pass safely through that kind of ice when towed properly either because of her inherent strength or because of protection by sheathing. Seaworthiness is to be tested by ability to perform the service undertaken. The T. J. Hooper, 2 Cir., 60 F.2d 737. A vessel is unseaworthy unless she is reasonably fit to carry her cargo safely despite the perils to be anticipated on the voyage. Spencer Kellogg & Sons v. Buckeye S.S. Co., 6 Cir., 70 F.2d 146; The Southwark, 191 U.S. 1, 24 S.Ct. 1, 48 L.Ed. 65. As she was subjected to no peril not to be anticipated and towed with due care, it was a reasonable inference that she was not fit when delivered for the service for which her owner delivered her to the carrier and so the finding that she was then unseaworthy is not clearly erroneous and we accept it.

By incorporating into the private carriage contract the provisions of the Carriage of Goods by Sea Act, 46 U.S.C.A. § 1300 et seq., and of the Harter Act, 46 U.S.C.A. § 190 et seq., the parties made their rights and liabilities dependent upon the provisions of those statutes. The Westmoreland, 2 Cir., 86 F.2d 96. Cf. Commercial Molasses Corp. v. New York Tank Barge Corp., 314 U.S. 104, 62 S.Ct. 156, 86 L.Ed. 89. The use of the barge by the carrier without any inspection whatever to determine its fitness for the intended service completely negatives the exercise of due diligence on its part to discover whether the barge was seaworthy when the voyage began or to make it so if it were not, and leaves the carrier liable to cargo for the loss caused by unseaworthiness without the benefit of the immunity provisions of the Harter Act. The carrier had the burden to prove such due diligence on its part. The Southwark, 191 U.S. 1, 24 S.Ct. 1, 48 L.Ed. 65; International Nav. Co. v. Farr & Bailey Mfg. Co., 181 U.S. 218, 21 S.Ct. 591, 45 L.Ed. 830; Navigazione Libera Triestina v. Garcia, 9 Cir., 30 F.2d 62. Having failed in this respect, there being no special contract, it became liable to cargo for the breach of an implied absolute warranty of the seaworthiness of the barge at the start of the voyage. The Southwark, supra.

But unless the terms of the charter expressly provided to the contrary, and here they did not, there was an implied personal warranty to the charterer by Reliance of the seaworthiness of the barge when delivered for the intended voyage and, because of the breach of that warranty, the carrier may recover from Reliance without limitation, whatever it may have to pay cargo for the loss caused by unseaworthiness. Cullen Fuel Co. v. W. E. Hedger, Inc., 290 U.S. 82, 54 S.Ct. 10, 78 L.Ed. 189.

There was, however, no privity of contract between Reliance and cargo and, without that, it is by no means clear that there is any direct liability on the part of Reliance to cargo for its loss. Davis v.

Dittmar, 2 Cir., 6 F.2d 141 and Loveland Co. v. Eastern States Farmer's Exchange, 3 Cir., 92 F.2d 180, do support the theory of direct recovery by cargo from Reliance but as we have held Reliance ultimately liable for the full amount of whatever cargo may recover we leave at large the question of its direct liability. Consequently there is no occasion for decision as to whether, if Reliance were directly liable to cargo, it would be entitled to limitation.

A motion for rehearing and to reopen for the taking of additional evidence after an amendment to the findings was made by Reliance in the district court and its denial is now presented as reversible error. That was an exercise of discretion which we should overturn only if shown to have been abused and the record does not make that appear.

Decree modified in accordance with this opinion and affirmed as so modified.