154 F.Supp. 461 (1957)
Matter of The Petition of PETTERSON LIGHTERAGE & TOWING CORPORATION, as owner of THE Lighter KOALA, for exoneration from or limitation of liability.
AMERLUX STEEL PRODUCTS CORPORATION, Libellant,
v.
M/V HOUFFALIZE, her engines, etc., Compagnie Maritime Belge (Lloyd Royal) S.A. and Trans-Oceanic Terminal Corp., Respondents,
and
Transoceanic Terminal Corporation, Respondent-Impleaded.
COMPAGNIE MARITIME BELGE (Lloyd Royal), S.A., Cross-Libellant,
v.
AMERLUX STEEL PRODUCTS CORPORATION, Cross-Respondent.
PETTERSON LIGHTERAGE & TOWING CORPORATION, as owner of THE Lighter KOALA, Libellant,
v.
BELGIAN LINE, Incorporated, formerly known as Atlantic Overseas Corporation, and Compagnie Maritime Belge (Lloyd Royal), S.A., Respondents,
and
Transoceanic Terminal Corporation, Respondent-Impleaded.
United States District Court S. D. New York.
September 5, 1957.
*462 Hill, Rivkins, Middleton, Louis & Warburton, New York City, George B. Warburton, New York City, of counsel, for libellant-cross-respondent Amerlux Steel Products Corp.
Hill, Betts & Nash, New York City, J. Newton Nash, Eli Ellis, Robert H. Peterson, New York City, of counsel, for Compagnie Maritime Belge (Lloyd Royal), S.A., et al.
Atkins & Weymar, New York City, Horace T. Atkins, William Weymar, New York City, of counsel, for respondent-impleaded Transoceanic Terminal Corp.
Kirlin, Campbell & Keating, New York City, Edward L. Smith, New York City, of counsel, for Petterson Lighterage & Towing Corp.
McGOHEY, District Judge.
These four causes which were tried together arise from the following event which, it is conceded, occurred at about 1:45 A.M. on January 15, 1953. The lighter Koala while tied up during calm weather alongside the vessel Houffalize in the slip south of Pier 14, New York, in the North River, careened against the vessel and cast her cargo of 442 tons of steel. This had been discharged several hours earlier from the vessel whose owner had chartered the lighter. Damage resulted to the lighter and the vessel. All of the cargo except three packets of reinforcing rods was salvaged. Some of this was damaged.
*463 Petterson, the owner of the lighter, petitioned for exoneration from, or limitation of, liability. In that proceeding Amerlux, the cargo owner, filed a claim for the lost and damaged cargo and Compagnie Maritime Belge, the vessel owner, filed claims for damage to its vessel and the cost of salvaging the steel.
Thereafter the other suits were commenced. The cargo owner sued the vessel, her owner and Transoceanic Terminal Corporation, the stevedores, and the vessel owner impleaded the stevedores. The lighter owner sued the vessel owner and its agent for the damage to the lighter and they impleaded the stevedores. The vessel owner sued the cargo owner for the cost of salvage.
Amerlux Steel Products Corporation is a New York corporation engaged in the importation and sale of steel products. It has an office and place of business at 100 Park Avenue, New York City. It was the owner and consignee of the steel which had been carried, under four bills of lading, from Antwerp, Belgium, aboard the M/V Houffalize.
Petterson Lighterage and Towing Corporation is a New York corporation with a principal office and place of business at 44 Whitehall Street, New York City. It is the owner of the Koala, a wooden lighter.
Compagnie Maritime Belge (Lloyd Royal) S.A. is a Belgian corporation with its principal place of business in Antwerp. It is engaged in the business of common carriage of goods by water for hire. It is the owner of the Houffalize. It berthed and discharged its vessels at Pier 14 North River, which it leased from the City of New York. The lease required the vessel owner at its own expense to maintain a depth of 30 feet below mean low water in the waters adjacent to the pier. On January 27, 1953, the city called upon the vessel owner to remove the steel from the slip. All parties to these causes, except Amerlux, agreed that the steel should be removed "for the account of whom it may concern." The vessel owner had this done.
Shortly before the vessel's arrival it was decided, because of crowded conditions on the pier, to discharge the steel onto a lighter. This arrangement made it possible to commence reloading the No. 2 hold from the pier as soon as discharge of the steel was completed at 5:30 P.M. on January 14.
Atlantic Overseas Corporation,[1] a New York corporation with an office and place of business at 63 Broad Street, New York City, was the agent of the vessel owner. On January 12, 1953, on behalf of the vessel owner, it effected an oral harbor demise charter of the Koala for an indefinite period under the terms of the usual oral New York harbor charter.
Transoceanic Terminal Corporation is a New York corporation with an office and place of business at 63 Broad Street, New York City. It is engaged in the business of stevedoring on vessels operated, managed or controlled by Compagnie Maritime Belge. It unloaded the steel from the vessel and stowed it on the lighter.
The cargo consisted of: (a) 329 packets of deformed steel reinforcing bars, each packet was 40 feet long and eight inches in diameter; (b) 19 steel I beams, each measuring 24 inches by 60 feet and having flanges 7-¼ inches high; (c) 23 steel I beams, each measuring 24 inches by 60 feet, having flanges 7 inches high; (d) 28 steel I beams, each measuring 20 inches by 60 feet, having flanges 6-¼ inches high. The total weight of the shipment was 442 long tons.
The lighter had a carrying capacity of 600 tons. Her dimensions were: net and gross registered tonnage 295; length 105 feet; breadth 34.7 feet; depth 8.2 feet.
The lighter was at least thirty-five years old at the time of the accident.
The careening of the lighter in calm weather while tied up to the vessel and carrying far less than her capacity *464 created a presumption of unseaworthiness.[2] Petterson attempted to rebut this presumption by evidence purporting to show that the lighter was regularly inspected and kept in good repair and that the careening resulted from improper stowage or negligence of the vessel's officers or both. The negligence alleged was that the officers left the forward starboard boom at the No. 2 hatch swung out over the ship's rail during the night, resulting in damage to the lighter which caused it to careen. The attempted rebuttal, as will appear, failed in all respects. Indeed, even without benefit of the presumption, unseaworthiness was clearly established by other evidence, particularly the testimony of the lighter captain.
Accordingly, Petterson will be held primarily liable without limitation for the lost and damaged cargo, the cost of removing it from the slip and the damage to the vessel. The vessel owner will be held secondarily liable to the cargo owner because, as bailee of the cargo, it was negligent, as will appear, in failing to inspect the lighter before using it. The vessel owner's agent and the stevedores will be exonerated.
Discharge of the steel onto the lighter commenced on the afternoon of January 13, 1953. The work continued through that night and until about 5:30 P.M. of the 14th. It is common ground that the packets of rods rested on top of the steel beams in the vessel's No. 2 hold and were lifted and stowed on the lighter first; that they were laid over a floor of dunnage laid on the lighter's deck; that they were stowed in tiers each consisting of 47 packets, four tiers at the forward end and three at the after end; that they overlapped or "nested" amidships; that dunnage was placed across the top tier where necessary in order to make a level surface for the beams.
The witnesses were in conflict as to how the beams were stowed. I find as follows. They were stowed in seven tiers, thirteen in the first tier and one less in each succeeding tier. They were laid with their flanges vertical so that the beams rested on the edges of the flanges and interlocked with the beams above and below. Short pieces of dunnage were placed here and there under the flange edges, where necessary to keep the stow level, but "layers" of dunnage were not laid between the tiers of beams, as Petterson contends. The outer beams in the first tier were wedged up with dunnage so as to make them "slant inward" towards the center of the barge.
An experienced disinterested stevedore foreman called by Petterson gave the opinion that a stow of cargo of the kind here involved should not exceed 7 feet in height. That is accepted as the correct standard here.
The witnesses were also in conflict as to the height of the stow. Petterson's expert Morse calculated it first at 10 and later at 11 feet. This, however, was on the assumption that the beams were stowed with their flanges horizontal, that they were not interlocked and that there were layers of dunnage between the tiers. On the assumption that the beams were stowed as I have found, he calculated the height of the stow at about 8 feet. Transoceanic's foreman who personally directed the stowage estimated the height at not more than 7 feet. Transoceanic's Vice President who had general charge of loading operations and his assistant also estimated it at 7 feet. These three witnesses were, indeed, not wholly disinterested. They, however, had seen the stow. Morse had not. His estimate was mere calculation made long after the event. Having seen and heard all these witnesses, I find no reason to doubt the men whose estimates were based on personal observation. They impressed me as truthful. Moreover, their testimony is more consistent with the agreed dimensions of the beams and packets and also with the testimony of the lighter *465 captain. While the latter did not estimate the height in feet, he said that he, 5 feet 8 inches tall, could "not quite" reach the top of the stow. He was a man of long experience, having been employed as a lighter captain by Petterson for 15 years. He was present throughout the loading. When he left the lighter at 6:00 P.M. on the 14th he considered her safe and had no criticism of the way she was loaded.
I find that the height of the stow was not more than 7 feet; that it was safe and proper and did not cause the careening or otherwise contribute to the loss.
The lighter captain testified that when he left the lighter at 6:00 P.M. on the 14th, she lay bow in, port side along the vessel's starboard and that the forward starboard boom at the vessel's No. 2 hatch was swung out over the ship's rail to which it was made fast by preventer stays. Captain Davis of The Bon, a Petterson tug, testified as follows. Shortly after 6:00 P.M. on the 14th, he brought his tug into the slip where the Koala lay, in order to take out some barges which were moored on the south side of the slip; that lying alongside the Houffalize he saw the Koala and also some other barges which "probably were all railroad barges" lying "more near the stern of the [Houffalize]"; he passed the slip again about 1:00 A.M. on the 15th and, looking into the slip, again saw several barges lying alongside the Houffalize; he came into the slip again at about 3:00 A.M. on the 15th, after the careening, and found a railroad barge lying "just under the bridge of the ship" and the Koala "laying at an angle across the bow of the ship." Petterson argues from this testimony that the probability is, the Koala was shoved forward during the night in order to make room for the railroad barge; that as the Koala moved forward, "presumably" her own boom swung to port, smashed against the preventer stays of the vessel's No. 2 boom, and then against her own mast stays which were thus broken; that all this "probably" caused the lighter to careen to port against the ship.
Captain Everard, chief mate of the vessel, testified from his log that all stevedoring work ceased at 10:00 P.M. on the 14th. He further testified that he then inspected all hatches and found all booms, including those at the No. 2 hatch, swung in above the ship's rail and secured; that he looked over the starboard side and saw the Koala, lying abreast the No. 2 hatch, but no other barges.
It is, of course, possible that some other barges or lighters were moored alongside the Houffalize later during the night. Whether this occurred is of no great moment. What is important is whether the boom was left swung out and whether the Koala was shoved forward from its position abreast the No. 2 hatch. The only witness who testified as to the position of the boom after 6 o'clock, was Captain Everard. The deck watch on duty that night was not called to testify. Petterson urges that the vessel owner's failure to call this man compels the inference that if called he would have contradicted Captain Everard with respect to the boom. This contention is rejected. Captain Everard impressed me as an efficient ship's officer and truthful. Although he was not a disinterested witness, he was responsive and frank. I have no reason to doubt him. I find that at least after 10:00 P.M. on the 14th the boom was not swung out over the starboard rail. In any event, it is clear that even if the boom had been left out, this could not have caused or contributed to the careening in the manner Petterson suggests, unless the lighter was moved towards the vessel's bow from its position abreast the No. 2 hatch. The utter improbability that this occurred was established by the uncontroverted testimony, which I accept, of the diver who located the steel at the bottom of the slip and the master of the salvage dredge. These men were obviously disinterested witnesses. They found the steel in one large heap about 75 feet off the side of the pier and from 130 to 180 feet out from the shore bulkhead. This area is just about abreast the part of the pier *466 which was in line with the vessel's No. 2 hatch. Therefore, when the lighter dumped her load she must have been lying abreast the No. 2 hatch as she was when her captain left her at 6 o'clock on the 14th. I find that she was and that she was not shoved forward as Petterson suggests.
The lighter was examined by surveyors the day after the accident and again some days later when she was in drydock. One of these surveyors, Bagger, was called by the vessel owner. Two others testified for Petterson. Bagger, on January 16, went through the hull carefully with a flash light. He found definite evidence of decay in several planks; seams caulked with cotton; at least one seam which "was three-quarters of an inch open on the inside * * * a hollow seam * * * not of recent origin"; and signs of old leakage. He examined her again in drydock on January 20, 1953, and found a number of slack seams on the sides. He also found defective caulking with old and lifeless oakum. He concluded that the lighter was unseaworthy prior to delivery under the charter. His findings were not seriously disputed by Petterson's experts but they vigorously disputed his conclusion of unseaworthiness. Their opinions are rejected on two grounds. The reasons they gave for their conclusions that the lighter was seaworthy were quite unpersuasive and are inconsistent with facts established by the lighter captain's testimony presently to be discussed. I accept Bagger's finding and his conclusion which are consistent with those facts.
According to the lighter's captain, when loading commenced during the afternoon of January 13 the lighter had about four or five inches of water in her hold, as "she always had." He said he did not pump her at that time and had not done so during the previous week during which, as far as appears, she was not in use. He remained on board during the night of the 13th. It does not appear whether he pumped her during that night. "Some time" during the morning of the 14th he examined the hold again. There was then "a little water in it." Although presumably the amount was not less than the four or five inches which she always had, he did not pump it out. He next examined the hold at 4 o'clock that afternoon. At that time he found she had "eight or nine inches" in her hold, having taken "some water" since his morning examination. She had indeed taken four inches since the morning. The water extended over an area about twelve feet square in the forward starboard corner. Although he pumped "as fast as [he] could" until 4:30 and got out all the pump could reach, at least "two or three" inches remained when he finished pumping. I accept this estimate, although it is less than he said "she always had." When the loading was finished at 5:30 he checked the hold again and found "five or six inches." He says he pumped again, and I accept this too. At six o'clock he left for the night, as was his regular custom when loading was not going on. He said that at 5:30 he "got the water out, there was no water whatsoever in the boat when I left." This I do not accept. It is utterly inconsistent with his prior testimony that when he got out all the pump could reach at 4:30 "two or three inches" remained in her; and that she "always" had "four or five inches" in her. He also testified that he had observed on prior occasions that her "leakage increased" when she submerged under her load. I find that when he left at six o'clock the lighter had at least two inches of water in her hold. I find that in the hour between 4:30 and 5:30 she had taken not less than three inches of water; and continued to do so at about that rate, so that by 1:45 A.M. on the 15th, she had taken not less than 24 inches in addition to the two inches she already had at 6:00 P.M. on the 14th. Twenty-six inches of water, as Petterson's own expert, Morse, testified, was more than enough to destroy her stability and to "make her lurch very easily" under the influence of swells or other disturbances from the outside.
In light of these findings based on the captain's testimony, I cannot accept the testimony of the two Petterson officers *467 that the lighter was inspected annually at the company's yard and checked monthly by the officer in charge of equipment. It is significant that not a single record of any repairs prior to the accident was introduced. In any event it is clear that the alleged inspection and repairs were inadequate if indeed they were ever made.
I find that the Koala was unseaworthy, not only at the time she careened but also when she was delivered under the charter; and that Petterson's officers either knew or neglected to discover her unseaworthy condition.
I find that any new damage to this old lighter's hull resulted from the careening and not from a blow by another vessel.
I find that the vessel was damaged by the lighter when she careened against the vessel.
The sea carriage of the steel from Antwerp was, of course, subject to the Carriage of Goods by Sea Act.[3] But, that Act does not apply of its own force to the period after cargo has left the ship's tackle.[4] Accordingly, whether it governs the period when this steel was on the lighter, as Amerlux contends, depends on whether the parties contracted in the bills of lading to make it apply to that period.[5] Clause 1 provided that the Carriage of Goods by Sea Act "(except as may be otherwise specifically provided herein) shall govern before the goods are loaded on and after they are discharged from the ship and throughout the entire time the goods are in the control of the Carrier." Two other clauses specifically provide otherwise. Clause 13 provided that "All lighterage and use of craft in discharging shall be at the risk and expense of the goods." And another clause stamped on the face of each bill provided that "Consignees must furnish lighters and/or trucks immediately on steamer's arrival and take delivery as fast as ship can discharge, otherwise the ship to be at liberty to discharge the goods on Pier or into hired lighters at consignees' and/or shippers', risk and expense." These three clauses read together make it clear that the parties did not contract to make the Act govern after the steel was stowed on the lighter.[6]
It is not disputed, however, that the shipowner was still bailee of the cargo to whose owner therefore it is liable if negligent. I find that it was negligent.
It is true as the vessel owner urges, that the proof does not show that "the careening of the lighter against the vessel was caused by any negligence of the vessel owner." That, however, while enough to defeat Petterson's claim against the vessel owner for damage to the lighter, is by no means enough to exonerate the vessel owner as bailee of the cargo. This lighter had been chartered by the vessel owner for a similar purpose on several prior occasions during October and November, 1952. In October she had taken 535 tons of steel reinforcing bars. In November she had, on three separate occasions, taken loads of steel weighing respectively 269, 252 and 344 tons. And according to the pier superintendent, on each of these occasions "the lighter was all right." But the shipowner offered no testimony as to how long these several cargoes remained on the lighter, or whether a captain was always aboard during such periods, or the amount of pumping done during those periods to overcome the lighter's leakage which admittedly increased when she was loaded. There was no testimony as to what or how much work the lighter had been engaged in during December, 1952 and up to January 13, 1953, when this steel was loaded on her. The shipowner offered no testimony as to what, if *468 any, inspection it made of this old lighter prior to loading on January 13. This failure to show that it made any inspection of the lighter prior to loading permits the inference that it made none.[7] But it is unnecessary to rely on this alone. As the findings based on Bagger's testimony show, the evidences of the lighter's unseaworthiness were old and apparent at the time it was delivered under the charter. Thus the inescapable inference from testimony introduced by the vessel owner itself is that, it either failed to inspect this obviously old lighter or, if it did so, it disregarded what the inspection disclosed. In either event it was a negligent bailee.[8]
If the parties are unable to agree on the amount of damages, a Special Master will be appointed to compute the amount.
Submit decrees in accordance herewith on notice.
NOTES
[1] Subsequent to the event out of which these suits arose its corporate name was changed to Belgian Line, Inc. and it was sued under that name.
[2] Cullen Fuel Company, Inc. v. W. E. Hedger, Inc., 290 U.S. 82, 54 S.Ct. 10, 78 L.Ed. 189; Petition of Reliance Marine Transport & Construction Corp., 2 Cir., 206 F.2d 240.
[3] 46 U.S.C.A. § 1300ff.
[4] See Mackey v. U. S. (The Yoro), 2 Cir., 197 F.2d 241.
[5] Federal Ins. Co. v. American Export Lines, D.C., 113 F.Supp. 540, at page 542.
[6] See 113 F.Supp. at page 543; also Remington Rand, Inc., v. American Export Lines, D.C., 132 F.Supp. 129, at page 138.
[7] Commercial Molasses Corp. v. N. Y. Tank Barge Corp., 314 U.S. 104, at page 111, 62 S.Ct. 156, 86 L.Ed. 89.
[8] See Petition of Reliance Marine Transp. & Const. Corp., 2 Cir., 206 F.2d 240, at page 243.